HOFMANN & SCHWEITZER
*Attorneys for Third-Party Plaintiff*
1130 Route 202 South, Suite A7
Raritan, NJ 08869
Tel: 908-393-5662    Fax: 212-465-8849
paulhofmann@hofmannlawfirm.com

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

------------------------------------------------------------------------------x

IN RE: COMPLAINT OF ADRIAN AVENA, AS OWNER          **1:21-cv-00515(NLH)(MJS)**
AND AA COMMERCIAL, LLC., AS OWNER PRO HAC
VICE, OF THE FISHING VESSEL CONCH'RD, FOR
EXONERATION FROM OR LIMITATION OF LIABILITY


------------------------------------------------------------------------------x


KIMBERLY WOLFE, AS PERSONAL REPRESENTATIVE OF
THE ESTATE OF AARON GREENBERG, AND ON
BEHALF OF KG, OVER WHOM KIMBERLY WOLFE IS THE
APPOINTED CO-GUARDIAN, AND WHO IS THE SURVIVING
MINOR  CHILD OF THE DECEDENT, AARON GREENBERG,

                                    **AMENDED**
                    Third-Party Plaintiff,     **THIRD-PARTY**
                                    **COMPLAINT**

        V.

DANIEL J. AVENA, THE UNITED STATES OF AMERICA,
CM HAMMAR AB and REVERE SURVIVAL, INC.

                    Third-Party Defendants.

------------------------------------------------------------------------------x

        KIMBERLY WOLFE, as the Personal Representative of the Estate of AARON

GREENBERG, brings the within Third-Party Complaint pursuant to FRCP Rule 14 against

DANIEL J. AVENA, THE UNITED STATES OF AMERICA, CM HAMMAR AB and

REVERE SURVIVAL, INC. as follows:

1.      This matter is brought within the admiralty and maritime jurisdiction of the court, is a

        claim within the meaning of rule 9(h) of the Federal Rules of Civil Procedure, and is also

        brought under the General Maritime Law of the United States as well as through the

        jurisdiction of 28 USC § 1333, this being a claim in excess of $75,000 exclusive of costs

        and interest and it being brought against completely diverse parties, and as to the claims

        against the United States of America by and through the negligence of the United States

        Coast Guard, by and through entitlement to assert claims pursuant to Suits in Admiralty

        Act, 46 U.S.C. §§30901 et. seq., and the Public Vessel Act, 46 U.S.C. §§31101 et. seq.

2.      The court also has jurisdiction pursuant to its pendent, ancillary and supplemental

        jurisdiction pursuant to 28 USC. § 1367.

3.      Reference is made to the complaint for exoneration from or limitation of liability filed in

        the proceeding entitled IN RE: COMPLAINT OF ADRIAN AVENA, AS OWNER AND

        IN PERSONAM AND AA COMMERCIAL, LLC., AS OWNER PRO HAC VICE, OF

        THE FISHING VESSEL CONCH'RD, FOR EXONERATION FROM OR

        LIMITATION OF LIABILITY, Civil Index No.: 1:21-cv-00515, filed within the United

        States District Court for the District of New Jersey on or about January 11, 2021, a copy

        of which is annexed hereto as exhibit A.

4.      Reference is also made to the answer and claim of KIMBERLY WOLFE, AS

        PERSONAL REPRESENTATIVE OF THE ESTATE OF AARON GREENBERG, AND

        ON BEHALF OF KG, OVER WHOM KIMBERLY WOLFE IS THE  APPOINTED CO-

        GUARDIAN, AND WHO IS THE SURVIVING  MINOR  CHILD OF THE

        DECEDENT, AARON GREENBERG, filed in the above-referenced limitation

proceeding, and a copy of which is annexed hereto as exhibit B.

5.      The claims asserted in this third-party complaint arise from the same events that led to the filing of the above-referenced limitation action, to wit, the sinking of the F/V CONCH'RD, a 32 foot fishing vessel which, on December 3, 2020 capsized and sank with the loss of life of one of the vessels two crew members, to wit, Aaron Greenberg.

6.      In her answer and claim, Kimberly Wolf asserts claims, on behalf of the beneficiary of Aaron Greenberg's estate for the damages related to Aaron Greenberg's unpaid earnings pre-death, for the loss of life and conscious pain and suffering of Aaron Greenberg and the loss of support, and society to his beneficiary and all other damages allowed by law. She asserts that, in whole or in part the wrongful death of Aaron Greenberg was caused by actions of Adrian Avena and or AA Commercial LLC.

7.      Third-party plaintiff herein now brings these additional claims for damages including for the survival causes of action and the loss of life of Aaron Greenberg against Daniel J. Avena, the United States of America, Hammar AB and Revere Survival, Inc. on the following causes of action.

## GENERAL STATEMENT OF FACTS

8.      Emergency Position Indicating Radio Beacons or EPIRBs are small, floatable devices used to alert search and rescue services in the event of an emergency involving, most often, a vessel capsizing or sinking. It does this by transmitting a coded message via the free-to-use, multi-national Cospas Sarsat network. SARSAT stands for Search and Rescue Satellite Aided Tracking, which is the U.S. developed program of the multi-national network. (COSPAS is a Russian acronym for its related program).

9.      Upon an EPIRB being activated a 406 MHz distress frequency signal is sent via satellite and earth stations to the nearest rescue co-ordination center which shunts the message to rescue authorities to process and react to. EPIRBs are installed on marine vessels and are registered through the national search and rescue organization for that specific boat.

10.     The registration with the national organization of an EPIRB with a particular boat allows faster confirmation of active emergencies distinguished from false alerts and helps provide for faster responses for responding agencies in a real emergency. EPIRBs can either be operated automatically after an incident by fitting them to an automatic release mechanism affixed to a vessel structure, whereby the EPIRB is released from its bracket once submerged, and allowing the unit's water contacts to activate an emergency signal, or EPIRBs can also be carried in bags and activated manually in an emergency.

11.     By law EPIRBs are registered to and to be designated to specific vessels. If an EPIRB is registered to a specific vessel, and then it is transferred to a different vessel, it must be re-registered upon installing it on the different boat.

12.     Commercial fishing vessels are required by law to carry EPIRBs. This is for good reason, as the fishing industry is one of the most dangerous in the world, with an ever-present risk of being swamped or sunk by dangerous seas, winds and tides.

13.     If an EPIRB activates and broadcasts an emergency signal, it generally means that a vessel to which it is attached has capsized and/or sunk. In such case, it must be assumed that there is a serious threat to the lives of those who were aboard the vessel. For that reason, it is extremely important that EPIRBs be registered in the United States with National Oceanographic and Atmospheric Administration (NOAA).

14.     Registration of EPIRBs is done with and at the NOAA National Beacon Registration

Database for U.S. coded beacons, part of the Search and Rescue Satellite Aided Tracking

System. Registration is required by law. Renewal of the registration is required on a

timely basis.  Transfer of an EPIRB from one associated vessel to a different vessel must

also be registered.

15.     Beacon registration is required by Federal regulations (Title 47 of the CFR , Parts 80, 87

and 95). Failure to register the beacon, or to notify the National Oceanic and Atmospheric

Administration (NOAA) of a change in beacon ownership, could result in penalties

and/or fines issued to the owner by the Federal Communications Commission. See

https://www.sarsat.noaa.gov/faq%202.html. (Last visited on November 5, 2021).

16.     The United States of America has a well-developed search and rescue system and

protocol for both shoreside events and marine events. The United States Coast Guard is

the primary agency of the United States for carrying out maritime searches and rescues on

the navigable waters of the United States.

17.     NOAA is an agency of the United States significantly involved with the system for

initiating and performing maritime searches and rescues. NOAA is the agency designated

to receive EPIRB signals, process them, and communicate them to the United States

Coast Guard so that the Coast Guard can take what it deems to be appropriate action to

determine the validity of a distress signal and then to carry out a marine search and rescue

if necessary. NOAA operates the nation's civil environmental satellites. These satellites,

which are used to monitor weather, also carry instruments that detect 406 MHz

emergency beacon broadcasts. As NOAA operates the satellites that carry search and

rescue instruments, and operates the equipment to receive and process distress signals, it is the lead agency in the United States for the Cospas-Sarsat Program.

18. Low Earth Orbiting Search and Rescue (LEOSAR) satellites can compute a location for a 406 MHz emergency beacon transmitting an emergency signal using a method called "Doppler shift". Computing a location using Doppler shift requires the satellite to be moving.

19. Geostationary Search and Rescue (GEOSAR) Satellites stay in one fixed location relative to the earth. GEOSAR satellites cannot provide an independent location of a 406 MHz emergency beacon, but they can provide near-instantaneous detection of an emergency signal. On average, the GEOSAR satellites provide a 46-minute time advantage over a LEOSAR satellite for first detection of a 406 MHZ emergency beacon.

20. On December 3, 2020 in the Atlantic Ocean off of Cape May, New Jersey the fishing vessel CONCH'RD in the early afternoon suffered a catastrophic capsizing due to the negligent operation of the vessel by Adrian Avena, acting on his own behalf or on behalf of a corporate defendant called AA Commercial, LLC. The loss of that vessel was due to negligence, and through the gross unseaworthiness of the vessel leading to the vessel taking on water, capsizing, and eventually sinking.

21. As a result of the capsizing Aaron Greenberg, the vessel's deckhand, was cast into the frigid waters of the Atlantic Ocean. Over the course of the next couple hours, he eventually developed hypothermia, loss of orientation, loss of function of his physical capabilities, and eventually succumbed to the ocean's waters and drowned. He suffered a horrendous death which could have been averted had the vessel been seaworthy and

Adrian Avena had not negligently operated same.

22.     Upon information and belief, the capsizing of the vessel happened at approximately 1:30 p.m. local time.

23.     Indisputable evidence shows that after a period of time subsequent to the capsizing of the vessel, an Emergency Position Indicating Radio Beacon (EPIRB) carried aboard the vessel began transmitting a signal that the vessel had submerged sufficiently to activate that  EPIRB's function. That EPIRB device was assigned by NOAA registration number 2DCC8-10FFCC-FFBFF (and was captured in the incident / "site" as no.  276667).

24.     That EPIRB was owned by and registered to third-party defendant Daniel J. Avena and associated with a vessel called the GOLD RUSH II. Upon information and belief, the GOLD RUSH II was/is a vessel owned by Daniel J. Avena.

25.     The registration of the EPIRB  to the GOLD RUSH II expired in November 2017, and was never renewed, and no authority was informed that the EPIRB with registration number 2DCC8-10FFCC-FFBFF (and incident / "site" no.  276667) was physically transferred to and installed on the CONCH'RD.

26.     EPIRB devices are designed to send radio broadcasts to various reception facilities and in particular a system of geostationary and orbiting satellites above the earth. In the coastal waters of and near the United States, upon receipt of the signals, the receiving satellite communicates with land based stations initially operated by NOAA. The signals from the devices carry various forms of information including information from which the device's location can be determined.

27.     On December 3, 2020, a geostationary satellite operated by NOAA received a broadcast

signal from the EPIRB device that had been installed aboard the CONCH'RD. The

EPIRB device broadcasting the signal was the device registered to the GOLD RUSH II,

with registration number 2DCC8-10FFCC-FFBFF. This signal was received at

approximately 2:07 p.m. local time.

28.     Within minutes the EPIRB registration number had been identified and the electronic

signal was forwarded to a NOAA base station which then forwarded the information to

the United States Coast Guard.

29.     Upon information and belief that report went to Coast Guard District 5 in

Norfolk/Portsmouth, Virginia.

30.     Upon information and belief, shortly after 2:07 p.m., urgent marine broadcasts by the

U.S. Coast Guard began advising that an EPIRB aboard or related to the vessel GOLD

RUSH II was sending out a distress signal. The broadcasts identifying the vessel in

distress as GOLD RUSH II began shortly after 2:09 p.m. and continued to at least until

2:31. Each broadcast during that time period referenced GOLD RUSH II and not

CONCH'RD as the vessel in distress.

31.     Simply because an emergency distress signal from an EPIRB signal has been received by

a geostationary satellite, or even a low-level or mid-level orbiting satellite, it does not

mean that the EPIRB's position can be immediately ascertained. Often several orbits of

passing low and mid-level satellites using triangulation technology and Doppler shift

analysis are necessary in order to fix a latitude and longitude position of the broadcasting

EPIRB.

32.     The fixing of a location of an EPIRB can take a significant amount of time as the EPIRB

signal passes from the satellite system, gets communicated to the earth and is then processed at data centers and is then forwarded to emergency personnel for handling.

33.     Upon information and belief, at approximately 2:30:36 p.m. local time sufficient data was acquired to determine a general latitude and longitude for the broadcasting EPIRB with registration number 2DCC8-10FFCC-FFBFF.  It was determined that the signaling EPIRB was somewhere within the search area of Sector Delaware Bay in District 5, in particular in the ocean in the vicinity of Coast Guard Station Cape May.  The Coast Guard in that Sector was tasked with the responsibility to appropriately respond to the emergency signaling.  An appropriate response includes determining whether it is a false alarm or an emergency and then taking appropriate search and rescue action.

34.     At about this time, 2:09 p.m. local time, a telephone call was made from the Coast Guard to third-party defendant Daniel J. Avena because it was determined that he was the owner of the signaling EPIRB, which bore registration number 2DCC8-10FFCC-FFBFF.  It had been registered in 2015 and associated with the vessel GOLD RUSH II, and the registration expired on November 3, 2017 and was not renewed.

35.     At about 2:36 p.m. local time another phone call was made between Daniel J. Avena and the Coast Guard, and for the first time the Coast Guard was advised that the signaling EPIRB was not affixed to or related anymore to the GOLD RUSH II, but rather it had been transferred to and affixed to a different vessel, the CONCH'RD.

36.     At that time, and for the past one hour, two soaked and freezing crewmembers, Aaron Greenberg, and Adrian Avena, were desperately holding onto the capsized floating hull of CONCH'RD.

37.   At either 2:36 p.m. or 2:40 p.m. the Coast Guard began urgent marine broadcasts that identified the previously described vessel in distress with the EPIRB signaling as the CONCH'RD, not the GOLD RUSH II.

38.   At approximately 2:44 p.m. a composite fix was finally determined on the exact location of the signaling EPIRB from CONCH'RD, and was made available to Coast Guard rescue units. The location of the vessel distress signal was determined to be at latitude 38. 55.3N, longitude 74.32.7W.

39.   At approximately 2:48 p.m. local time, the composite fix was communicated to Coast Guard sector Delaware Bay and/or Coast Guard station Cape May, and that information in turn became usable for performing an actual search and rescue.

40.   At about 2:48 p.m., the Coast Guard also informed third party defendant Daniel J. Avena in a telephone conversation where the composite fix location of the EPIRB signal was.

41.   Third-party defendant Daniel J. Avena contacted acquaintances of Adrian Avena as well as his own friends and acquaintances attempting to muster a private rescue response.

42.   The United States Coast Guard, at approximately 2:53 p.m. local time, directed the Coast Guard cutter, the LAWRENCE LAWSON, to divert from its then current mission to go to aid the CONCH'RD. The LAWSON eventually arrived at the scene of the sinking of approximately 4:01 p.m.

43.   Upon information and belief, at around 2:44 p.m. a Coast Guard helicopter was working over the Atlantic Ocean not far from the site of the capsized vessel performing law enforcement activities. Assuming that information is correct that helicopter could have been and should have been diverted at that time, or previously about 2:31 p.m. to the

scene to attempt to rescue the CONCH'RD crew, but was not.

44. Upon information and belief, a 'ready waiting' helicopter at station Cape May was detailed to the scene of the capsizing at approximately 3:16 p.m. local time and arrived on site at approximately 3:26 p.m.

45. According to statements attributed to petitioner Adrian Avena, Aaron Greenberg lost his grip on the upturned floating hull of the CONCH'RD and floated off and submerged, succumbing to the sea and drowning at approximately 3:15 p.m.

46. The first rescue boat, operated by good Samaritans, arrived at the scene at approximately 3:35 p.m. and rescued Adrian Avena. The rescue boat, ironically, was in fact a very fast sport fishing vessel owned by Adrian Avena called the JERSEY BOY and operated by Adrian and Daniel Avena's acquaintances/friends.

47. During the period around 1:30 p.m. through 3:00 p.m., local commercial fishing operations were being performed by numerous fishing vessels in the vicinity where CONCH'RD had been fishing as well.

48. One commercial fisherman working upon his own conch boat advised that he saw CONCH'RD performing fishing operations that afternoon at a time which would have been shortly before CONCH'RD capsized.

49. Fishermen working on the water near CONCH'RD's location have stated that had a Coast Guard urgent marine broadcast been made that it was the CONCH'RD that was the vessel in distress based on the signaling from the EPIRB associated with it, they could have and would have gone to the aid of the vessel, and would have had sufficient time to arrive and save the life of Aaron Greenberg. However, because urgent marine broadcasts between

2:09 PM and 2:40 PM were stating that the vessel in distress whose EPIRB was signaling was the GOLD RUSH II, not the CONCH'RD, these potential good Samaritans, who could have saved and would have saved Aaron Greenberg, took no action upon hearing the messages. This is because they were not familiar with a fishing vessel GOLD RUSH II, nor would they have known where that vessel generally would have been on the open ocean. However, if the broadcasts had been about the CONCH'RD being the vessel in distress, these fisherman would have known the boat, its operators and where was the likely location where it would have been working, as it was known to be a 'conch boat." Those fisherman working on the water could have and would have stopped working and gone to provide aid and assistance to the CONCH'RD and its crew, including Aaron Greenberg.

50.     The failure of the early Coast Guard broadcasts to identify the boat in distress as the CONCH'RD, instead of GOLD RUSH II, significantly delayed the private vessel rescue response which would have saved Aaron Greenberg. These delays are directly attributable to the failure of Third-Party Defendant Daniel J. Avena failing to properly register the EPIRB with NOAA, associating the device with CONCH'RD, as he should have. Those delays contributed to the death of plaintiff's decedent.

51.     The Coast Guard 'ready waiting' helicopter arrived at the site of the capsized vessel at approximately at 3:36 p.m. local time, and directed the JERSEY BOY to return to port with Adrian Avena. Aaron Greenberg was nowhere to be found, having slipped under the waves some 20 minutes earlier.

52.     Third Party Defendant, CM Hammar AB, is upon information and belief, a Swedish

corporation with a principal place of business in Gothenburg, Sweden.

53.   Third Party Defendant, Revere Survival Inc., is upon information and belief, a Delaware corporation with a principal place of business in Jacksonville, Florida. Upon information and belief, the hydrostatic release equipped on the Vessel was manufactured and/or sold by CM Hammar AB.

54.   Upon information and belief, the vessel was equipped with a liferaft.  The liferaft failed to deploy despite the fact that it had a hydrostatic release mechanism which was supposed to deploy the vessel if the device was submerged 1.5 meters.

55.   Upon information and belief, at the time of the vessel's partial sinking/capsizing, the Vessel was equipped with a liferaft manufactured and/or sold by Revere and  equipped with a Revere liferaft rack, and hydrostatic release manufactured and/or sold by Hammar, which were sold as a package.

56.   On or about December 3, 2020, when the Vessel partially sank, the hydrostatic release, which automatically deploys the liferaft in emergency situations, failed to release the liferaft when submerged, causing, in whole or in part, the death of Aaron Greenberg.

57.   On or about December 3, 2020, Aaron Greenberg was lost at sea and presumed dead due to the negligence and other liabilities of Third Party Defendants Hammar and Revere.

**FIRST CAUSE OF ACTION: NEGLIGENCE OF DANIEL J. AVENA**

58.   Third-party defendant DANIEL J. AVENA ("D. Avena") outfitted the operation of the CONCH'RD. He acted as an independent agent or volunteer, assisting Petitioner ADRIAN AVENA ("A. Avena") to get his conch business, using the CONCH'RD, off

the ground so it could become viable and profitable.

59.     The EPIRB with registration number 2OCC810FFCFFBFF was installed on CONCH'RD by D. Avena at the end of September, 2020 or early October 2020, more than two months before the tragic sinking of CONCH'RD.

60.     D. Avena failed to re-register the EPIRB with registration number 2OCC810FFCFFBFF with the appropriate authority, NOAA, at any time after November 3, 2017, when its prior registration expired, although he was required to do so by law when he transferred the device to and had it installed on the CONCH'RD.

61.     The failure to re-register the EPIRB after installing it on the CONCH'RD constituted a violation of federal law, was negligence and constitute negligence per se.

62.     At approximately 2:09 on December 3, 2020 D. Avena was contacted by the United States Coast Guard from Norfolk, Virginia advising him that his lapsed registered EPIRB was providing a distress signal from EPIRB and it had been received by NOAA and forwarded to the Coast Guard. At that time he was asked if it was a false alarm to which he responded that it was not a false alarm. At that time he did not advise the caller that he had shifted the EPIRB from GOLD RUSH II to CONCH'RD.

63.     He failed to advise that he had installed, or allowed to be installed, the EPIRB on the CONCH'RD and it was no longer associated with GOLD RUSH II because he knew that he had violated federal law by not doing so.

64.     Not only was the failure to properly register the EPIRB with the appropriate federal authorities a violation of law, that failure caused confusion with the federal authorities charged with performing searches and rescues in the marine environment. This greatly

-14-

delayed a broadcast to the marine community in sector Delaware Bay, and specifically in and about station Cape May, that the distress signal received was from the CONCH'RD, and not GOLD RUSH II.

65.     The first time that D. Avena informed the Coast Guard that the EPIRB was on the CONCH'RD was at about 2:40 p.m. local time. Thus, approximately 31 minutes passed by with the Coast Guard broadcasting urgent marine broadcasts misidentifying which vessel was in distress.

66.     Many commercial fishing vessels were working nearby the last location of the upright CONCH'RD, and knew of its location where it was working. If an urgent marine broadcast had been made identifying the CONCH'RD as the vessel in distress some or all of those vessels could have and would have come to the aid of the seafarers on CONCH'RD and would have saved Aaron Greenberg's life.

67.     D. Avena's negligence and violation of federal law by not properly registering the EPIRB thus created confusion as to the identity of the vessel in distress after the emergency transmissions from the EPIRB were received, and his not immediately advising the Coast Guard of that failure was a proximate cause of Aaron Greenberg not being saved and thus caused his wrongful death, because broadcasts were made mis-identifying the correct vessel, delaying search and rescue operations.

68.     D. Avena was negligent as aforesaid, and was careless and reckless in not fulfilling his duties and responsibilities with respect to the registration of the EPIRB, the purpose of which was to save lives in the marine environment if and when a catastrophe occurred to a vessel and its crew.

69. By reason of the negligence of D. Avena, A. Avena, AA Commercial LLC and the United States of America, jointly and severally, and the unseaworthy condition of the vessel, Aaron Greenberg was severely injured, suffered physical and psychological injuries; he sustained injury, shock and trauma to his body, he was caused to have hypothermia, eventually leading to his drowning death. His beneficiary, his daughter K.G. is losing, has lost and will lose the financial support, comfort and social support, loss of society, education and advice of her father, all of which shall be compensated by the trier of fact. By reason of the matters aforesaid, the beneficiary of claimant's decedent's estate was and is deprived of his financial and emotional support and guidance, loss of society and such other elements of damages for his wrongful death to which in this action the beneficiary and the personal representative of the estate are entitled to claim under the laws of the State of New Jersey and the General Maritime Law.

70. By reason of the foregoing claimant claim damages in the amount found fair and reasonable by the trier of fact.

## SECOND CAUSE OF ACTION:  NEGLIGENCE OF THE UNITED STATES, BY THE UNITED STATES COAST GUARD

71. Claimant repeats and realleges each of the foregoing allegations, and those in the annexed answer and claim, as if each and every one was fully restated herein.

72. The United States Coast Guard had an obligation to accurately and correctly convey among its various offices, agents, sectors, and stations information provided to it by D. Avena, when the Coast Guard contacted him with respect to the initial notification from the geostationary satellite.  At that time D. Avena may have told the Coast Guard that the

EPIRB in question was on the CONCH'RD, not the GOLD RUSH II.

73.    D. Avena may contend that upon receiving the initial phone call from the Coast Guard he

advised the Coast Guard that the EPIRB was not on the vessel called GOLD RUSH II,

but was on the F/V CONCH'RD, on which his son A. Avena and Aaron Greenberg were

fishing.

74.    Claimant herein is concerned that third party defendant Daniel J. Avena will contend that

at approximately 2:09 on December 3, 2020 he was contacted by the United States Coast

Guard in or about Norfolk, Virginia advising that an emergency signal from his EPIRB

with registration number 2OCC810FFCFFBFF, and assigned to the GOLD RUSH II, had

been received. At that time he was asked if it was a false alarm. At that time, he

responded it was not a false alarm. Claimant is concerned that D. Avena will contend that

in that phone conversation he advised the caller from the Coast Guard that he had shifted

the EPIRB from GOLD RUSH II to CONCH'RD.  If he did so, then the Coast Guard mis-

managed that information, delaying Coast Guard and private rescue efforts, because the

Coast Guard broadcasted misinformation about the correct vessel in distress.  As such,

the Coast Guard was negligent and that negligence was a proximate cause of Aaron

Greenberg's death.

75.    Whomever that agent, employee or officer was of the Coast Guard who had that

communication with D. Avena at or about 2:09, if that Coast Guard person was told that

the EPIRB signaling its immersion was actually on CONCH'RD, and then that person

failed to fully and appropriately pass on that correct information that the EPIRB that was

emergency signaling was related to the CONCH'RD and not the GOLD RUSH II, then

that person's failure to do so was negligent.  This failure caused the urgent marine broadcasts that started approximately at 2:09 PM to misidentify the vessel *in extremis*, negligently causing delays in search and rescue responses from the Coast Guard assets. The mis-communication further delayed private individuals, who could have and would have gone to the scene of the capsized vessel and rescued Aaron Greenberg, from going to CONCH'RD's aid. The failure of the Coast Guard for approximately 31 minutes to broadcast the correct name of the vessel in trouble was a proximate cause of Aaron Greenberg's death because, but for that delay, private good Samaritans could have and would have rescued him.

76.  This failure was not performed as a discretionary function by the Coast Guard, its agents, employees or officers.

77.  Further causing harm to claimant and claimant's decedent is that at least from approximately 2:09 p.m. through 3:00 p.m. on December 3, 2020, upon information and belief, the United States Coast Guard had a helicopter and other assets working over the ocean and on the ocean in the area where the CONCH'RD had capsized. At approximately 2:40 p.m. the exact location of the broadcasting EPIRB from CONCH'RD became known. The Coast Guard could have and should have directed that helicopter and/or other assets to the scene of the capsizing to provide rescue and aid to the two seamen who had been aboard the vessel, but did not, constituting negligence on the Coast Guard's part.

78.  Inexplicably, the Coast Guard failed to promptly direct that helicopter asset and/or other assets, other than the LAWSON, to travel to the site from which the EPIRB was

transmitting and rescue the seamen hanging on to the hull of the capsized vessel.

79.     Those failures were not an exercise of a discretionary function by the Coast Guard, its

agents, employees or officers.

80.     By reason of the negligence of the United States of America, jointly and severally, with

the petitioners and D. Avena, Aaron Greenberg was severely injured, suffered physical

and psychological injuries; he sustained injury, shock and trauma to his body, he was

caused to have hypothermia, eventually leading to his drowning death. His beneficiary,

his daughter K.G. is losing, has lost and will lose the financial support, comfort and social

connection of her father, all of which shall be compensated by the trier of fact. By reason

of the matters aforesaid, the beneficiary of claimant's decedent's estate was and is

deprived of his financial and emotional support and guidance, loss of society and such

other elements of damages for his wrongful death to which in this action the beneficiary

and the personal representative of the estate are entitled to claim under the laws of the

State of New Jersey and the General Maritime Law.

81.     By reason of the foregoing claimant claim damages in the amount found fair and

reasonable by the trier of fact.


**THIRD CAUSE OF ACTION: AGAINST HAMMAR AND REVERE FOR
STRICT PRODUCT LIABILITY**

82.     Claimant repeats and reallege each and every allegation contained in the above

paragraphs with the same force and effect as if fully set forth herein.

83.     Upon information and belief, Hammar and/or Revere are the designers, manufacturers,

distributors and/or sellers of the liferaft and hydrostatic release installed onboard the

Vessel at the time of the casualty.

84.     At all times material hereto, Hammar and/or Revere were engaged in the business of introducing the liferaft and hydrostatic release into the stream of commerce and did so by marketing and selling same to Third-Party Daniel Avena, who along with Plaintiff Adrian Avena, installed the liferaft and hydrostatic release mechanism on the vessel CONCH'RD prior to its ill-fated voyage on December 3, 2019.

85.     The hydrostatic release was designed and warranted to deploy the liferaft upon immersion of the Vessel, for the specific purpose of saving a vessel's crew and or passengers.

86.     Upon information and belief, the liferaft and hydrostatic release was designed and/or manufactured Hammar and/or Revere was defective, rending it unreasonably dangerous to the crew aboard the Vessel.

87.     On or about December 3, 2020, the Vessel partially sank, the Hammar hydrostatic release was sufficiently submerged, but did not release, leaving the Vessel's two crew clinging to the bow, and Aaron Greenberg was thereafter lost at sea.

88.     As a result of the defective and improper design and/or manufacture of the hydrostatic release, the liferaft aboard the Vessel remain submerged and failed to deploy, causing, in whole or in part, the presumed death of Aaron Greenberg.

89.     Had the liferaft aboard the Vessel deployed as it should have, after the vessel submerged, Aaron Greenberg could have and would have used it to save himself.

90.     As a result of defective manufacture, defective design of the liferaft and hydrostatic release device, and the distribution and sale of the defective hydrostatic release, Hammar and/or Revere are strictly liable to the Estate of Aaron Greenberg for his personal injury

and wrongful death.

**FOURTH CAUSE OF ACTION AGAINST HAMMAR AND REVERE: BREACH OF WARRANTIES**

91.   Claimant repeats and reallege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

92.   In installing the liferaft and hydrostatic release on the Vessel, Plaintiffs relied upon express and implied warranties by the Third Party Defendants HAMMAR and Revere, including but not limited to, express warranties as to the safety, simplicity and efficiency of the liferaft and hydrostatic release, as well as the implied warranties of workmanlike performance and fitness for its intended purpose.

93.   The express warranty breached is that the hydrostatic release mechanism sold to Daniel Avena and installed upon CONCHR'D would, among other things, deploy the liferaft if submerged 1.5 meters.

94.   Prior to Aaron Greenberg's death, while he was desperately holding onto the partially submerged vessel, attempting to save his and Adrian Avena's life, the liferaft and hydrostatic release mechanism were submerged more than 1.5 meters, upon information and belief.

95.   Revere and Hammar breached the above express warranty, other express warranties and implied warranties.

96.   Revere and Hammar breach's of the express and implied warranties resulted in the death of Aaron Greenberg, and damages to the Claimant for which claim herein is made.

**FIFTH CAUSE OF ACTION: AGAINST HAMMAR AND REVERE FOR NEGLIGENT MISREPRESENTATION**

97.     Claimant repeats and realleges each and every allegation contained in the above

paragraphs with the same force and effect as if fully set forth herein.

98.     Third Party Defendants HAMMAR and Revere made negligent representations about the

design, manufacture, operability, suitability, quality, safety, efficacy, and use of the

liferaft and hydrostatic release.

99.     Upon information and belief, Plaintiffs relied on those representations in having the

liferaft and hydrostatic release installed on the Vessel and Aaron Greenberg relied upon

the representations in agreeing to work upon the vessel, and further, while working on the

vessel.

100.    As a result of Revere and Hammar's misrepresentations, Aaron Greenberg died because

the hydrostatic release did not release the liferaft when submerged contrary to the

representations made by these third-party defendants that the equipment was safe and

would perform as represented.

101.    As a result of said misrepresentations, third-party defendants are liable for the death of

Aaron Greenberg.


**SIXTH CAUSE OF ACTION AGAINST HAMMAR AND REVERE: NEGLIGENCE**

102.    Claimant repeats and realleges each and every allegation contained in the above

paragraphs with the same force and effect as if fully set forth herein.

103.    Third Party Defendants, Revere and Hammar, negligently designed, manufactured, sold

and distributed the liferaft and hydrostatic release fitted on the Vessel.

104.   As a result of the negligence of Third Party Defendants Revere and Hammar, Aaron
Greenberg died because the hydrostatic release did not release the liferaft, which failed to
deploy when submerged.

105.   As a result of the negligence of Third Party Defendants Revere and Hammar, Claimant
asserts claims for damages for the wrongful death and survival claims she asserts for the
wrongful death of Aaron Greenberg.

**SEVENTH CAUSE OF ACTION: HAMMAR'S AND REVERE'S FAILURE TO
WARN**

106.   Claimant repeats and realleges each and every allegation contained in the above
paragraphs with the same force and effect as if fully set forth herein.

107.   Third Party Defendants HAMMAR and Revere had a duty to provide proper warnings to
Plaintiffs and their deckhands, including claimant's decedent, Aaron Greenberg,
regarding the deployment and use of the liferaft and hydrostatic release and any history of
failures thereof.

108.   Third Party Defendants failed to provide proper warnings to Plaintiffs and their
deckhands regarding the deployment and use of the lift raft and hydrostatic release and
any history of failures thereof.

109.   As a result of the failure by Third Party Defendants to provide proper warnings, it
contributed to Aaron Greenberg dying because, in this case, the hydrostatic release did
not release the liferaft when it was submerged even though plaintiffs and Mr. Greenberg
had expectations it would release, and further, were not warned of failures of other and

-23-

similar make and model liferaft release mechanisms, nor were they warned of what could

or should be done to insure deployment of the liferaft in the eventuality that the vessel

upon which they were working submerged, capsized or otherwise had a failure which

called for use of the life raft.

110.    As a result of the failure by Third Party Defendants to provide proper warnings, Aaron

Greenberg died, and claimant herein brings claims for damages for the death of Mr.

Greenberg and a survival claim for the damages suffered by him and his estate and

beneficiary.

WHEREFORE, claimants pray that judgment be entered against the petitioners and third-

party defendants on the within causes of action, and for such other and further relief, including

interest, attorneys fees and punitive damages, if warranted.

Dated: Raritan, New Jersey                  HOFMANN & SCHWEITZER
      January 11, 2022                  *Attorneys for Third-Party Plaintiff*

By: _____
      Paul T. Hofmann (PH1356)
      1130 Route 202 South, Ste. 7A
      Raritan, New Jersey 08869
      Tel: 908-393-5662  Fax: 212-465-8849
      paulhofmann@hofmannlawfirm.com