HOFMANN & SCHWEITZER
Attorneys for Third-Party Plaintiff
1130 Route 202 South, Suite A7
Raritan, NJ 08869
Tel: 908-393-5662    Fax: 212-465-8849
paulhofmann@hofmannlawfirm.com

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
-------------------------------------------------------------------x

                                         HON. KAREN WILLIAMS

IN RE: COMPLAINT OF ADRIAN AVENA,
AS OWNER AND AA COMMERCIAL, LLC.,      1:21-cv-515 (KMW)(MJS)
AS OWNER PRO HAC VICE, OF THE FISHING
VESSEL CONCH'RD, FOR EXONERATION
FROM OR LIMITATION OF LIABILITY

-------------------------------------------------------------------x

### BRIEF IN OPPOSITION TO THIRD-PARTY DEFENDANT UNITED STATES' MOTION FOR JUDGMENT ON THE PLEADINGS AND MOTION TO DISMISS

 

HOFMANN & SCHWEITZER
Attorneys for Third-Party Plaintiff

By: _____
      Paul T. Hofmann (PH1356)
      1130 Route 202 South, Ste. 7A
      Raritan, New Jersey 08869
      908-393-5662 Fax: 212-465-8849
      paulhofmann@hofmannlawfirm.com

# TABLE OF CONTENTS

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .ii

I.   Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

    A.   Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.   Factual Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

         1.Timeline of Events on December 3, 2020. . . . . . . . . . . . . . . . . . . . . . . . . 4

III. Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

IV.  Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Point 1.   The Discretionary Function Immunity of the Coast Guard is Inapplicable to this Case as the Coast Guard Addendum Policy Required it to Follow a Non-Discretionary, Specified Course of Action
           . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

    A.   Impact of the Coast Guard Addendum Policy on the Discretionary Function Immunity and the Actions Taken by the Coast Guard in Response to the CONCH'RD Rescue Operation
         . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Point II:  Claimant has Adequately Plead that the Coast Guard's Negligence in Mishandling Vital Information and Failure to Follow the Coast Guard's Own Addendum Policies Breached the Good Samaritan Duty of Care
           . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

    A.   The Coast Guard's Mishandling of Vital Information Worsened the Position of Aaron Greenberg and Breached the Good Samaritan Duty of Care
         . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    B.   Suitable Aircraft Were *Required* to be Dispatched to the Vessel in Distress by Coast Guard Search and Rescue Addendum Policies Once the General Location Information of the Loss was Received
         . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

V.   Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

## TABLE OF AUTHORITIES

**Statutes**                                                                     **Page(s)**

28 U.S.C. § 1346 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

28 U.S.C. § 2680(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

46 U.S.C. §§ 741 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

46 U.S.C. §§ 781 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

46 U.S.C. §§ 30501 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . .2

47 U.S.C § 80 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

47 U.S.C § 87 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

47 U.S.C § 95 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

Fed. R. Civ. P. 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 6, 7

## Cases

*Albright v. Oliver*, 510 U.S. 266 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Azille v. United States,* 2008 A.M.C. 2820 (DVI Nov. 13, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Baker v. Cuomo,* 58 F.3d 814 (2nd Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

*Baum v. United States*, 986 F.2d 716 (4th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Berkovitz v. United States*, 486 U.S. 531 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8, 9, 15

*Berkshire Fashions. Inc. v. M.V. Hakusan II,* 954 F.2d 874 (3rd Cir. 1992) . . . . . . . . . . . . . . . .7

*Chance v. Armstrong*, 143 F.3d 698 (2nd Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

*Conley v. Gibson*, 366 U.S. 41 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

*Cranford v. United States*, 466 F.3d 955 (11th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*DeMuria v. Hawkes*, 328 F.3d 704 (2nd Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

*Deravin v. Kerik*, 335 F.3d 195 (2nd Cir 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

*Fondow v. United States*, 112 F. Supp. 2d 119 (D. Mass. 2000) . . . . . . . . . . . . . . . . . . . . . . .16, 17

*Greco v. Trainer, Cohen & Thomas, LLP*, 412 F.3d 360 (2nd Cir. 2005) . . . . . . . . . . . . . . . . . .6

*Hurd v. United States*, 34 F. App'x 77 (4th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Indian Towing v.United States*, 350 U.S. 61 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18, 19

*Kim v United States*, 940 F.3d 484 (9th Cir. 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 25

*Lane* v. *United States*, 2020 WL 1427419 (D. Mass. 03-24-2020) . . . . . . . . . . . . . . . . . . . . . . . 23

*Lewis v. United States*, No. 3:01-cv-821, 2002 Wl 34104078 (M.D. Fla. Nov. 6, 2002) . . . . . . .24

*Matter of Moore*, 488 F. Supp. 3d 231 (D. Md. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15, 16

*Muniz-Rivera v. United States*, 326 F.3d 8 (1st Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . .9, 10, 24

*Oneida Indian Nation of New York v. City of Sherrill,* 337 F.3d 139 (2nd Cir. 2003). . . . . . . . . 7

*Patentas v. United States*, 687 F. 2d 707 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19, 20

*Pegram v. Herdrich,* 530 U.S. 211 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

*Perrodin v. United States*, 350 F.Supp.2d 706 (D. S.C. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Piechowicz v. United States*, 885 F. 2d 1207 (4th Cir 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

*Ragin v. New York Times Co.*, 923 F.2d 995 (2nd Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

*Sagan v United States,* 342 F.3d 493 (6th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Scheuer v. Rhodes*, 416 U.S. 232 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

*Thames Shipyard and Repair Co. v United States*, 350 F.3d 247 (1st Cir. 2003). . . . . . . . .10, 16, 17

*Turner v. United States,* 736 F.3d 274 (4th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 24

*United States v. Gaubert*, 499 U.S. 315 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Gavagan,* 280 F.2d 319 (1960). . . . . . . . . . . . . . . . . . . . . . . . .20, 21, 22, 23, 24, 25

*United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),*
467 U.S. 797 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## Treatises

Restatement (Second) of Torts § 323 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16,19

Schoenboaum, 2 ADMIRALTY & MAR. LAW § 20:1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

## Other

U.S. Coast Guard, *Coast Guard Addendum to the United States National Search and Rescue Supplement* (SAR Addendum), COMDTINST M161320.2F, at 2 (Jan. 7, 2013)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10, 11, 12, 13, 14, 23, 24, 25

## I.    PRELIMINARY STATEMENT

Third-Party Plaintiff, Kimberly Wolfe, as the Personal Representative of the Estate of Aaron Greenberg ("Claimant"), respectfully submits this brief in opposition to Third-Party Defendant United States' Motion to Dismiss. The United States seeks dismissal of all claims against it pursuant to FRCP Rules 12(c) and 12(h)(3). The Motion should be denied in its entirety because claimant satisfies the federal notice pleading requirement as to all of its claims and appropriately alleges sufficient elements of a prima facie case against the United States for each such claim, asserting facts sufficient to sustain claims of negligence against the U.S.  Alternatively, if this Court determines that claimant fails to sufficiently allege claims to permit the trier of fact to find that the United States is liable, then claimant requests permission to file an Amended Complaint to more fully clarify the claims.

## II.    BACKGROUND

### A.    PROCEDURAL BACKGROUND

Following the sinking of the vessel the "CONCH'RD" on December 3, 2020 and deckhand Aaron Greenberg's tragic death at sea, Captain Adrian Avena and his company, AA Commercial, LLC, (hereinafter "Petitioners") filed a petition under the Limitation of Liability Act, 46 U.S.C. §§ 30501 *et seq.* on January 11, 2021. ECF No. 1. In response, Kimberly Wolfe, as personal representative of the decedent, Aaron Greenberg,  filed her initial Answer and Counterclaim against Petitioners on November 9, 2021. ECF No. 18, alleging wrongful death claims under the Jones Act and general maritime law. Also on November 9, 2021, Kimberly Wolfe filed a separate Third-Party Complaint against Daniel Avena and the United States for their roles in causing Aaron Greenberg's death. ECF No. 19. On January 11, 2022, Kimberly Wolfe Amended her Third-Party Complaint to

-1-

include products-liability claims against Revere Survival, Inc. and CM Hammar AB, the makers and distributors of life-saving equipment alleged to have failed that, in part, caused Mr. Greenberg's death. ECF No. 33.

Third-Party Defendant United States filed the within Fed. R. Civ. P. 12(c) and 12(h)(3) motion for judgment on the pleadings and to dismiss. ECF No. 58. Claimant opposes the motion by showing how her pleadings appropriately assert several claims of negligence for the actions of the United States Coast Guard (hereinafter "Coast Guard") showing how it mishandled vital, time-sensitive information, and failed to follow its own mandatory rescue procedures required of it as stated in its comprehensive policy document, the Coast Guard Search and Rescue Addendum Policy, relevant excerpts of which are annexed as Exhibit 1 to the affidavit of Paul T. Hofmann. Those failures, claimant asserts, contributed to Mr. Greenberg's demise. These failures were non-discretionary actions by the Coast Guard, which worsened Mr. Greenberg's position after the vessel capsized, thus breaching the Coast Guard's Good Samaritan duty of care.

### B.    FACTUAL BACKGROUND

On December 3, 2020, Adrian Avena captained the commercial fishing vessel F/V "CONCH'RD." The vessel was owned by AA Commercial of which Mr. Avena was the sole proprietor. He employed Aaron Greenberg to work as a deckhand. The vessel had an Emergency Position Indicating Radio Beacon (hereinafter, "EPIRB"), with registration number 2OCC810FFCFFBFF. An EPIRB is a device that, when a vessel capsizes and/or sinks, releases a cannister containing a radio beacon which emits a distress radio message to alert certain first responders to a potential maritime human emergency. Once an EPIRB is activated, a 406 MHz distress frequency signal is sent via satellite to earth receiving stations at the nearest rescue

coordination center to the emergency, the center then shunts the message to rescue authorities to process and respond. EPIRBs are installed on marine vessels in the United States and are registered through a national search and rescue organization. The relevant organization for the registration here is the National Oceanographic and Atmospheric Administration (NOAA). The responding agency to the emergency here, after notification of a potential emergency, was the United States Coast Guard. If an EPIRB activates and broadcasts an emergency signal, it generally means that a vessel to which it is attached has capsized and/or sunk. In such a case, it must be assumed that there is a serious threat to the lives of those who were aboard the vessel. For that reason, it is extremely important that EPIRBs be registered. Regulations in the United States regarding this emergency service are found in 47 CFR §§ 80, 87, 95.

The EPIRB in question was owned by Daniel Avena, Adrian's father. The EPIRB was registered to a vessel called the "GOLD RUSH II." At the time of the accident, the registration had expired, and it had not been re-registered by Daniel Avena to the CONCH'RD as required by federal regulations. The registration expired in 2017. However, when it was moved to the CONCH'RD in 2020, the Avenas both failed to register it to that boat. See, ECF No. 33, ¶¶ 11, 24-25, 27.

## 1.   TIMELINE OF EVENTS ON DECEMBER 3, 2020

On December 3, 2020, with Adrian Avena captaining CONCH'RD, and Aaron Greenberg working as deckhand, the men set out to fish in the ocean around Cape May, New Jersey. Claimant alleges the timeline of the events that day to be as follows:

- **At approximately 1:30 p.m.**, while fishing twelve miles from the coast of Cape May, the CONCH'RD capsized, throwing both Adrian Avena and Aaron Greenberg into the freezing waters of the Atlantic Ocean around Cape May. ECF No. 1, ¶¶ 8-9; ECF No. 33, ¶¶ 20, 22, 38; ECF No. 33, ¶ 21.

- **At approximately 2:07 p.m.**, after both Adrian Avena and Aaron Greenberg had been cast in the water approximately 37 minutes earlier, a satellite picked up an EPIRB transmission and identified the vessel in possible distress as the GOLD RUSH II. ECF No. 33, ¶¶ 27-29.

- **At approximately 2:09 p.m.**, Coast Guard personnel began placing urgent marine information broadcasts advising the "GOLD RUSH II" might be in distress. Also at this time, the Coast Guard placed a first phone call to Adrian Avena's father, Daniel Avena, whose number remained listed on the expired registration for the EPIRB that was broadcasting. During this phone call, Daniel Avena asserts he relayed that this alert from the EPIRB was not a false alarm. Questions of fact exist whether Daniel Avena also informed the Coast Guard personnel that the EPIRB was not, in fact, on the GOLD RUSH II, but rather, on the CONCH'RD. ECF No. 33, ¶¶ 30, 34, 62-63; ECF No. 34, ¶¶ 62-63. The Coast Guard denies this alleged statement. ECF No. 40, ¶¶ 50, 72-75. Mr. Avena, however, denies that he did not advise the Coast Guard of the change from the GOLD RUSH II to the CONCH'RD. *See*, ECF No. 34, ¶¶ 62-63, Claimant's Amended Complaint, and ECF No. 33, ¶¶ 62-63, Daniel

Avena Answer.

- **At approximately 2:30 p.m.**, the satellite returned a general position for the broadcasting EPIRB as within the search area of Sector Delaware Bay in District 5, in particular, in the ocean in the vicinity of Coast Guard Station Cape May. ECF No. 33, ¶ 33.

- **At approximately 2:36 p.m.**, a second phone call between Coast Guard personnel and Daniel Avena took place. It is only after this call that the Coast Guard corrected their previous urgent marine broadcasts and stopped making calls for the GOLD RUSH II, and began broadcasting that the CONCH'RD was a vessel in distress. ECF No. 33, ¶¶ 35, 37, 65.

- **At approximately 2:44 p.m.**, the satellite determines the exact location of the EPIRB signal to be latitude 38.55.3N, and longitude 74.32.7W. ECF No. 33, ¶ 38.

- **At approximately 2:48 p.m.**, the information regarding the latitude and longitude of the CONCH"RD reaches the local Coast Guard. It is at this time the Coast Guard phones Daniel Avena and informs him where the composite fix location of the EPIRB signal was. In any event, at some point the Coast Guard relayed the EPIRB's location to Daniel Avena. Daniel Avena then relayed this location to acquaintances who raced to Cape May to take a sport fishing vessel, the "JERSEY BOY," also owned by Adrian Avena, to begin their own rescue attempt. ECF No. 33, ¶¶ 39-41, 46.

- **At approximately 2:53 p.m.**, the Coast Guard directs the cutter, the "LAWRENCE LAWSON" to aid in the search for the CONCH'RD and its crew. The Coast Guard also sorties a rescue helicopter from Air Station Atlantic City, which begins its preflight procedures at about this time. ECF No. 33, ¶¶ 42, 44.

- **At approximately 3:15 p.m.**, Aaron Greenberg succumbed to the freezing waters of the

Atlantic Ocean after around an hour and forty-five minutes of clinging to the capsized CONCH'RD. Adrian Avena sees him slip under the water's surface and drown. ECF No. 1, ¶ 14; ECF No. 33, ¶¶ 45, 51.

- **At approximately 3:16 p.m.**, the Coast Guard helicopter finished preflight procedures and departed from Air Station Atlantic City to aid the CONCH'RD. ECF No. 33, ¶ 44.

- **At approximately 3:35 p.m.**, the JERSEY BOY arrived at the scene of the capsized CONCH'RD and pulled Adrian Avena from the water. ECF No. 33, ¶ 46.

- **At approximately 3:36 p.m.**, the Coast Guard helicopter arrived at the scene of the capsized CONCH'RD and directed JERSEY BOY to return to Cape May with Adrian Avena. (Another Coast Guard vessel coming from Cape May met the returning JERSEY BOY on JERSEY BOY's way back to Cape May.) See, Generally,  ECF No. 33, ¶ 51.

- **At approximately 4:00 p.m.**, the Coast Guard cutter LAWRENCE LAWSON arrived at the scene of the capsized CONCH'RD. ECF No. 33, ¶ 42.

## III.   STANDARD OF REVIEW

The legal test on a motion to dismiss under FRCP 12(c) is similar that of a motion under FRCP 12(b)(6). *Deravin v. Kerik*, 335 F.3d 195, 200 (2nd Cir 2003). The burden on a 12(b)(6) motion lies with the moving party. *Ragin v. New York Times Co.*, 923 F.2d 995, 999 (2nd Cir. 1991). The Court, in assessing that burden, must treat all allegations in the complaint as true, resolve all doubts and inferences in the pleader's favor, and view the pleading in a light most favorable to the non-moving party. *Albright v. Oliver*, 510 U.S. 266, 267 (1994); *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Greco v. Trainer, Cohen & Thomas, LLP*, 412 F.3d 360, 363 (2nd Cir. 2005). The Court must not dismiss the action, unless it appears beyond doubt that the plaintiff can prove no set of facts

in support of his claims which would entitle him to relief. *Conley v. Gibson*, 366 U.S. 41, 45-46 (1957); *Chance v. Armstrong*, 143 F.3d 698, 701 (2nd Cir. 1998); *Oneida Indian Nation of New York v. City of Sherrill,* 337 F.3d 139, 152 (2nd Cir. 2003). The issue is not "whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support his claims." *Rhodes,* 416 U.S. at 236; *DeMuria v. Hawkes*, 328 F.3d 704, 706 (2nd Cir. 2003). The Court should be reluctant at the pleading stage to dismiss claims that press novel legal theories, when those claims can be better examined following development of the facts via discovery. *Baker v. Cuomo,* 58 F.3d 814, 818-19 (2nd Cir. 1995). Finally, the pleading party's memorandum of law may be used by the Court to clarify the allegations in the pleading. *Pegram v. Herdrich,* 530 U.S. 211, 229 (2000).

Rule 12(h)(3) provides that "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." FRCP 12(h)(3). Accordingly, motions brought pursuant to Rule 12(h)(3) are subject to the same standards as motions to dismiss for want of subject matter jurisdiction brought pursuant to Rule 12(b)(1). *Perrodin v. United States*, 350 F.Supp.2d 706 (D. S.C. 2004); see also, *Berkshire Fashions. Inc. v. M.V. Hakusan II,* 954 F.2d 874, 880 (3rd Cir. 1992) (motions under 12(b)(1) and 12(h)(3) are governed by identical standards except that the latter may be asserted at any time and need not be responsive to a pleading). In ruling upon motions of dismissal, including the Third-Party Defendant's here, the "trial court is required to view the complaint in the light most favorable to the plaintiff." *Id.* As set forth in greater detail below, the United States' motion fails to meet these standards and thus its motion should be denied.

## DISCUSSION

**POINT I:**  **THE DISCRETIONARY FUNCTION IMMUNITY OF THE COAST GUARD IS INAPPLICABLE TO THIS CASE AS THE COAST GUARD ADDENDUM POLICY REQUIRED IT TO FOLLOW A NON-DISCRETIONARY, SPECIFIED COURSE OF ACTION**

The United States asserts that the claimant fails to show that the government's discretionary function immunity does not apply to the facts of this case, thus claimant fails to meet her burden of establishing subject-matter jurisdiction as a result. Claimant contends that she sufficiently pleads that the actions–or lack thereof–taken by the United States Coast Guard and its personnel did not involve "discretion" and that their failure to immediately divert resources upon receiving information regarding the general location of the CONCH'RD violated the procedure required by the Coast Guard's own policy. Since the Coast Guard's policy specifically instructed Coast Guard personnel to follow a specified course of action, the conduct was non-discretionary and outside of the immunity provided by the Discretionary Function rule.

"[T]he United States is immune from suit unless it consents to be sued." *Cranford v. United States*, 466 F.3d 955, 958 (11th Cir. 2006). The Suits in Admiralty Act (SAA) "provides a waiver of sovereign immunity and the sole jurisdictional basis for admiralty claims against the United States, that do not involve public vessels ..." *Id.* 46 U.S.C. §§ 741 *et seq.* Whereas, the Public Vessels Act (PVA) "provides a waiver of sovereign immunity for admiralty claims involving public vessels." *Id.*; 46 U.S.C. §§ 781 *et seq.*  However, "[b]oth waivers are subject to the discretionary immunity function exception of the Federal Tort Claims Act (FTCA)." 28 U.S.C. § 1346. Claimant alleges one or both statutes apply here establishing federal admiralty jurisdiction.

The Coast Guard has certain but not unlimited discretion to exercise its judgment in

determining how to go about search and rescue operations. In determining if an action is within the discretionary function immunity, the Court must initially identify the conduct that allegedly caused the harm. *United States v. Gaubert*, 499 U.S. 315, 322 (1991). Then, to determine whether the exception applies, the Court employs a two prong test.

First, the court must determine whether the challenged conduct involves an element of judgment, meaning that it is "a matter of choice for the acting employee." *Berkovitz v. United States*, 486 U.S. 531, 537 (1988); *Baum v. United States*, 986 F.2d 716, 720 (4th Cir. 1993); *Piechowicz v. United States,* 885 F.2d 1207, 1211 (4th Cir. 1989).

Significant to the within matter, conduct is considered non-discretionary "if a federal statute, regulation, or policy specifically instructed federal officials to follow a specified course of action." *Muniz-Rivera v. United States*, 326 F.3d 8, 15 (1st Cir. 2003).

Second, the court "must determine whether that judgment is of the kind that the discretionary function was designed to shield," meaning that it involved "governmental actions and decisions based on considerations of public policy." *Berkovitz*, 486 U.S. at 536-37; *Gaubert,* 499 U.S. at 323-324. Furthermore, "the focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis. *Id.* at 324-325; see also *Baum*, 986 F.2d at 720-721.

The purpose of the discretionary function exception is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984). The core inquiry is whether the decision in question is one inherently expected to be grounded in policy considerations. *Baum*, 986 F.2d 720-721.

**A.    Impact of the Coast Guard Addendum Policy on the Discretionary Function Immunity and the Actions Taken by the Coast Guard in Response to the CONCH'RD Rescue Operation**

The Discretionary Function Immunity provides a safe haven of immunity to the government, to a certain extent, if its decision was "whether or how" to render aid. *Thames Shipyard and Repair Co. v United States*, 350 F.3d 247 (1st Cir. 2003), discusses why what happened here was not discretionary. It states "that [governmental] conduct is non-discretionary 'if a federal statute, regulation, or policy specifically instructed federal officials to follow a specified course of action.'" *Id.* at 247. (quoting *Muniz-Rivera,* 326 F.3d at 15). Furthermore, "if a statute or policy directs mandatory and specific action, the Federal Tort Claims Act's (FTCA) discretionary function exception is inapplicable to a dispute because there can be no element of discretion when an employee has no rightful option but to adhere to the directive." 28 U.S.C.A. § 2680(a). *Kim v United States*, 940 F.3d 484 (9th Cir. 2019).

The Coast Guard Addendum's Search and Rescue (SAR) Policy outlines the Coast Guard's non-discretionary actions to be taken in responding to maritime emergencies and shows why the court should find the discretionary function defense inapplicable here. *See* U.S. Coast Guard, *Coast Guard Addendum to the United States National Search and Rescue Supplement* (SAR Addendum), COMDTINST M161320.2F, at 2 (Jan. 7, 2013) (hereinafter "Addendum").

The distinctions between a Coast Guard discretionary policy, one which the Coast Guard could claim supports the discretionary policy defense, and a mandatory policy stated in the Addendum is spelled out for the parties and the Court at page 'xvii' of the document.

-10-

There the Addendum states:

### NOTES TO READERS

**NOTE 1: Policy and Doctrine**
The hallmark of policy is the use of the terms "must" and "shall." These are mandatory terms. They require compliance or action. The term "prescribe" encompasses the term "restricts." Thus, other hallmarks of policy are the terms "must not" and "shall not."

By comparison, the hallmark of doctrine is the use of the terms "can" and "may." These are permissive terms. The term "should" is a mandatory term **unless justifiable reason** exists for not complying. Since there is a significant degree of judgment included within its use, the term "should" is more associated with doctrine than policy.

The term "will" is sometimes used in the place of "shall." This is incorrect in the context of both doctrine and policy. "Will" applies only to a statement of future condition and should not be used in the place of "shall."

*Source: Doctrine Study Group Final Report, 01 April 2009*

**NOTE 2: Use of *Bold/Italic***
Items highlighted by ***bold/italic*** text are policy. This marking is based on the use of the terms "shall" and "must" (this includes, of course, "shall not" and "must not"). However, this marking is not all inclusive; some items constitute policy but do not currently use the terms "shall" or "must." Future changes will address highlighting of all policy statements.

(Bold and Italics in original). Thus, in accordance with the Coast Guard's own regulatory process, below claimant shows several <u>mandatory</u>, not discretionary, policies violated by the Coast Guard in this matter.

While many potential rescue situations leave actions to the discretion of Coast Guard personnel in deciding when, and how best to undertake a rescue, the Coast Guard was required to respond differently in the case before this Court as described in Policy 4.1.6.1 on Page 4-9 of the Addendum which states:

**Obtain Information and Classify Case. When the Coast Guard receives a call**

**for assistance, the SMC shall evaluate the circumstances to determine the severity of the case using information obtained from the mariner.** It is the **initial** determination that will govern how a case is to be initially treated. Later developments may cause the SMC to reclassify the case and modify the response. If there is any question as to the degree of danger to persons or property, the case should be classified as being in the DISTRESS phase. *A SAR event is dynamic. Information must be obtained and evaluated as the case progresses. The SMC shall take action appropriate to the situation.*

(Bold and italics in original).

Here, the Coast Guard received the initial alert from the EPIRB at 2:07 p.m., and phoned Daniel Avena at 2:09 p.m. He relayed to the Coast Guard that it was not a false alarm and that there was no question as to the extreme degree of danger posed to the men aboard. Therefore, Policy 4.1.6.1 required the Coast Guard to classify this case as being in a "DISTRESS" phase. The Addendum defines a "DISTRESS" phase as follows:

**Distress.** *Immediate response shall be initiated, if feasible, to any known situation in which the mariner is in imminent danger.* This response may be provided by regular Coast Guard; Coast Guard Auxiliary; or other federal, private, state, local, or commercial entity resources. The SMC may use all sources of assistance in a distress situation without concern for conflict with private enterprise. (Italics present in original).

(Bold and italics in original). Coast Guard Addendum Policy 4.1.5.1, Page 4-7.

Furthermore, Procedure Policy 4.1.6.2 states:

**4.1.6.2 Distress.** For cases determined to be in the DISTRESS emergency phase: (a) **Respond Immediately If Able.** Immediate response may be by either Coast Guard or Coast Guard Auxiliary resources. The SMC might be aware that other resources, such as private, local/state-operated vessels, or commercial providers, might be responding. That fact, however, normally should not delay or preclude a Coast Guard response. If Coast Guard resources cannot or are not responding, the caller should be notified.
**NOTE:** *As mentioned in 4.1.6.1, if a case is classified as distress, the Coast Guard shall respond immediately if able, to include broadcasting a UMIB and dispatching appropriate resources.*

(Bold and italics in original). Coast Guard Addendum Policy 4.1.6.2, Page 4-10.

Therefore, after the initial phone call to Daniel Avena, the Coast Guard was required by policy to treat the case as being in the DISTRESS phase which further required it to respond immediately. The allegations in the Third-Party Complaint show the Coast Guard was 'able' to respond, but inappropriately, did not. The Coast Guard Addendum provides further instruction on how it was required to respond to cases involving 406 MHz EPIRB alerts:

> **(2)    Registered but Unlocated 406 MHz Alerts.** Treat registered, but unlocated 406 MHz alerts as distress, exploit all reasonable means to ascertain distress position and assist the party in distress, including issuing a UMIB.
>
> a.    Registered, but unlocated 406 MHz alerts signal distress, but contain no position information. ***In order to render assistance we must exploit all reasonable means to ascertain at least a general distress position.*** Armed with a general position or usual operating area and suitable homing capable response assets, we are able to render timely, effective assistance.
>
> b.    EPIRB registration points of contact are usually the most promising leads for information, particularly for position, situation and further points of contact. In addition, UMIBs should be used as a means to determine distress position and to maximize resource of opportunity response, unless there are compelling reasons to the contrary. When only general position information is available, suitable aircraft should be launched to direction find on the 406 MHz beacon's signal.
>
> c.    For incidents where no position information other than homeport is available, issuing a UMIB in the vessel's homeport area is appropriate.

(Bold and italics in original). Coast Guard Addendum Policy 3.4.4.2(2)(a-c), Page 3-35.   While Coast Guard decisions about whether, when, or how to undertake a rescue are generally discretionary, the Coast Guard Addendum Policies referenced above denote a clear response procedure to which Coast Guard personnel were required to adhere. In short, once the Coast Guard learned there was a question as to the danger posed to Adrian Avena and Aaron Greenberg, they were required to treat this as a "DISTRESS" phase case in accordance with Policy 4.1.6.1. Further, upon undertaking to rescue the men and starting the urgent marine information broadcasts, Policies

-13-

3.4.4.2(2)(b), 4.1.5.1, and 4.1.6.2 required the Coast Guard to dispatch suitable aircraft upon receiving the general location of the EPIRB signal.

The general location of the vessel was returned by the satellite at approximately 2:30 p.m. as within the search area of Sector Delaware Bay in District 5, in particular, in the ocean in the vicinity of Coast Guard Station Cape May. The EPIRB's exact latitude and longitude was determined at approximately 2:44 p.m., and this location information reached Coast Guard personnel at 2:48 p.m. It was not until 2:53 p.m. that the Coast Guard dispatched the cutter the "LAWRENCE LAWSON" and began pre-flight preparations of a rescue helicopter at Air Station Atlantic City. These pre-flight procedures took approximately 23 minutes as the rescue helicopter began heading to the location at approximately 3:16 p.m. As a result, the helicopter arrived at the location of the CONCH'RD at 3:36 p.m., approximately 20 minutes after Aaron Greenberg slipped under the freezing waters and drowned.

The Coast Guard's failure to direct rescue vessels to the area of the sinking, to direct a helicopter already over the ocean to the scene, and to prepare a land-based additional helicopter for launch upon receiving the general location of the incident breached Addendum Policy 3.4.4.2 requiring Coast Guard personnel to launch suitable aircraft to home in on the direction on the 406 MHz beacon's signal once the general position information was available.

As to the helicopter on the pad at Atlantic City, the decision to wait to begin pre-flight procedures until after the exact location of the EPIRB was returned was *not* up to Coast Guard personnel's discretion and resulted in a negligent delay in clear breach of the required Addendum Policies. The failure to dispatch the helicopter after receiving the general location led to a significant delay had the pre-flight procedures been initiated prior to obtaining the general location of the

-14-

EPIRB.

Further, the failure to divert other aircraft or vessels already on the ocean nearby the location of the emergency, upon learning of the general location of where the incident happened contributed to Mr. Greenberg not being rescued. Every single second counted regarding the needed rescue of Aaron Greenberg. Had other vessels and aircraft been diverted, or if the aircraft at Atlantic City started pre-flight procedures and launched when general location information was available, as required, there would have been time enough to save him.

As to the Atlantic City based helo, there would not have been at minimum, a 23 minute delay in responding during the time waiting to prepare resources until exact location information was available. The trier of fact could find it is highly likely that these various Coast Guard assets would have arrived prior to Mr. Greenberg slipping under the freezing waters at approximately 3:15 p.m., 20 minutes or so prior to the Coast Guard's aircraft and vessel's actual arrival time at 3:36 p.m.

*Matter of Moore*, 488 F.Supp.3d 231 (D. Md. 2020), is distinguishable. There, all action taken by the Coast Guard in deciding whether, how, and which assets to deploy to undertake a search and rescue mission for a vessel capsized in treacherous seas was up to the discretion of Coast Guard personnel. In granting the government's motion to dismiss, the Court also looked to the Coast Guard's Addendum Policy but found the decisions made by Coast Guard personnel "[were] undertaken in light of their judgment and experience" and not required by a specific Addendum directive. *Id.* at 238. Unlike here, the Plaintiffs in *Matter of Moore* failed to point to any non-discretionary policy that Coast Guard personnel were required to follow and as a result the Court found the Coast Guard had "discretion in determining whether and how to search for the [vessel in distress]." *Id.* at 239.

-15-

Here, however, the Addendum Policies discussed above do set forth very specific requirements on *when* the Coast Guard should have responded after receiving the general location information of the CONCH'RD. While the Coast Guard was within its discretion in choosing *which* suitable aircraft to send, the Addendum Policies removed any discretion in choosing *when* to send them. It is this failure to abide by policy directives that passes the *Berkovitz-Gaubert* analyses and sets this case apart from the *Matter of Moore* decision.

**POINT II:   CLAIMANT HAS ADEQUATELY PLEAD THAT THE COAST GUARD'S NEGLIGENCE IN MISHANDLING VITAL INFORMATION AND FAILURE TO FOLLOW THE COAST GUARD'S OWN ADDENDUM POLICIES BREACHED THE GOOD SAMARITAN DUTY OF CARE**

The Coast Guard does not have an affirmative duty to initiate a water rescue. *Turner v. United States,* 736 F.3d 274, 280 (4th Cir. 2013). However, once the Coast Guard undertakes a rescue operation, the Good Samaritan doctrine applies requiring the Coast Guard to act with reasonable care. Schoenboaum, 2 ADMIRALTY & MAR. LAW § 20:1; *Turner,* 736 F.3d at 280. "There are two ways in which a rescuer can worsen the position of the subject of the rescue. The first is by increasing the risk of harm to the person in distress. The second is to induce reliance, either by the subject or other potential rescuers, on the rescuer's efforts." *Hurd v. United States*, 34 F. App'x 77, 84 (4th Cir. 2002).  "The Court must consider the Coast Guard's actions and decisions in the dawn light of the information known during the rescue and not … hindsight." *Fondow v. United States*, 112 F. Supp. 2d 119, 131 (D. Mass. 2000). Specifically, the Second Restatement of Torts, which succinctly states the rule, provides,

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise

such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking. Restatement (Second) of Torts § 323 (1965).

The Coast Guard has been held liable for stating they would initiate a rescue, causing other possible rescuers to stand down, and causing harm when the Coast Guard delayed. *Sagan v United States,* 342 F.3d 493 (6th Cir. 2003). This relies on a theory of induced "reasonable, justifiable" detrimental reliance. The reliance must have caused another "to forgo other remedies or precautions against the risk." In the maritime context, detrimental reliance has been found where the "Coast Guard's actions caused potential rescuers to rest on their oars ... in reliance on the Coast Guard's undertaking and its presumed, unless affirmatively disclaimed, competency." *Fondow*, 112 F. Supp. 2d at 130 (citations and internal quotation marks omitted); *Thames Shipyard and Repair Co.*, 350 F.3d at 261.

### A.   The Coast Guard's Mishandling of Vital Information Worsened the Position of Aaron Greenberg and Breached the Good Samaritan Duty of Care

Claimant alleges that the Coast Guard was likely initially informed that the EPIRB in issue was transferred to the CONCH'RD, and was not on the GOLD RUSH II and therefore, it was the CONCH'RD which was in distress. See, ECF No. 33, ¶¶ 72-75. Upon information and belief, during the 2:09 p.m. phone conversation with the Coast Guard, Daniel Avena asserted that the EPIRB alert was not a false alarm, that he had transferred the EPIRB from the GOLD RUSH II to the CONCH'RD, and that the CONCH'RD was the vessel in distress. ECF No. 33, ¶¶ 62-63; ECF No. 34, ¶¶ 62-63. The Coast Guard admits that its initial broadcasts failed to state that the vessel in distress was the CONCH'RD. ECF No. 33, ¶ 30; ECF No. 40, ¶¶ 30. It admits its original and many subsequent broadcasts referenced the GOLD RUSH II not CONCH'RD, the correct name of the vessel that Adrian Avena and Aaron Greenberg were aboard. ECF No. 33, ¶¶ 30, 50; ECF No.

40, ¶¶ 30, 50.[1]

Claimant alleges that the failure to note this vital information–the correct vessel name–caused the Coast Guard to put out marine broadcasts for the wrong vessel from 2:09 p.m. to 2:36 p.m., approximately 27 minutes. ECF No. 33, ¶¶ 30, 35, 37. This error harmed Mr. Greenberg's chances of being rescued because other fishermen in the ocean were aware of the CONCH'RD's position, knew its crew, and would have come to its aid if they heard a broadcast from the Coast Guard that the CONCH'RD was in distress. Had that scenario occurred, Mr. Greenberg likely would have been saved. ECF No. 33, ¶¶ 48-50. The "mistake" of the Coast Guard broadcasting the wrong vessel's name could be found by the trier of fact to have been a proximate cause of Mr. Greenberg's death.

In *Indian Towing v. United States*, 350 U.S. 61 (1955) the Supreme Court explained how to apply Good Samaritan liability. There, Plaintiffs brought action against the United States for damages sustained when their tug ran aground due to negligent operation of a lighthouse by the Coast Guard. *Id.* at 61-62. In analyzing the Coast Guard's duties the Court stated "it is hornbook tort law that one who undertakes to warn the public of danger and thereby induces reliance must perform his 'good Samaritan' task in a careful manner." *Id.* at 64-65. The Court acknowledged that the Coast Guard need not undertake the lighthouse service, but once it exercised discretion to operate the lighthouse and "engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning." *Id.* at 126-127. As a result of its

---

[1] Making the broadcasts was not discretionary. See SAR Addendum 4.1.6.2. Giving incorrect information such as allegedly happened here clearly was not discretionary.

failure to do so, the Supreme Court found the Coast Guard in breach of its Good Samaritan duty, and found the United States liable. *Id.* at 127.

Likewise, in *Patentas v. United States,* 687 F.2d 707 (1982) the Third Circuit applied *Indian Towing* to a vessel related breach of the Good Samaritan duty doctrine where plaintiffs alleged the Coast Guard breached its duty of care by failing to properly inspect a tanker vessel, thus, negligently increased their risk of harm by allowing the tanker to continue discharging cargo, leading to a catastrophic explosion. *Id.* at 714. While the Court found the plaintiffs failed to sufficiently state their claims, the court's analysis aids in analyzing the within matter. *Patentas* noted the good Samaritan principle which "makes one person liable to another for breach of a duty voluntarily assumed by affirmative conduct, even when that assumption of duty is gratuitous. *Id.* at 713-714, (quoting *Indian Towing*, 350 U.S. at 76). The Court then focused its analysis on Restatement Sections 324 and 324A, the latter of which provides:

> Liability to Third Person for Negligent Performance of Undertaking
> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

*Id.* at 714-715.

The Court, however, found the plaintiffs' causation argument unavailing, because they failed to sufficiently allege facts showing that they relied on the Coast Guard's inspection to their detriment. *Id.* at 717. Specifically, that they failed to allege that their knowledge of the Coast Guard's undertaking "induced (them) to forgo other remedies or precautions against (the) risk." *Id.*

Here, once the Coast Guard undertook placing urgent marine information broadcasts, it was obligated to use due care in doing so. Once Daniel Avena informed Coast Guard personnel that the EPIRB was, upon information and belief in the initial phone conversation with the Coast Guard, on the CONCH'RD, not the GOLD RUSH II, the Coast Guard's incorrect broadcasts engendered reliance on that information. The Coast Guard's error filled broadcasts, and failure to timely correct the errors until a subsequent phone call with Daniel Avena approximately 27 minutes later, was negligent and constituted a distinct breach of its rescue obligations. As stated in her complaint, Claimant is aware of at least one fishing vessel in the area, that had knowledge of the CONCH'RD's location and crew and would have responded to the distress calls had the broadcast been that the CONCH'RD was the vessel in distress, not the GOLD RUSH II. ECF No. 33, ¶¶ 48-50. Unlike the plaintiffs in *Patentas*, claimant asserts that the Coast Guard personnel's failure to broadcast the correct vessel name was a failure to exercise reasonable care in breach of Restatement section 324A(a). Furthermore, claimant asserts, there was detrimental reliance by other potential rescuers that, in effect, the CONCH'RD was not in distress, which led potential other rescuers to forgo responding, to the detriment of Aaron Greenberg.

Claimant contends that the mis-communication made Aaron Greenberg's situation worse, akin to what happened in *United States v. Gavagan,* 280 F.2d 319 (5th Cir. 1960) where the government's liability stemmed from the negligent manner in which it undertook the unsuccessful rescue of the crew of a sinking vessel. Acting pursuant to the National Search and Rescue Plan, the Coast Guard dispatched numerous vessels and aircraft to search for a vessel reported to be in distress. Among those assets was a reconnaissance plane which discovered the sinking vessel, and relayed the location to command and mistakenly informed command that it also spotted an incoming

-20-

Coast Guard vessel on its way to perform a rescue. *Id.* at 324. However, the officers in the plane realized several minutes later that the alleged 'approaching Coast Guard vessel' was actually an illusion from whitecaps on the sea, and immediately reported the error to command. *Id.* However, command inexplicably failed to make note of the correction, and in believing that a non-existent Coast Guard vessel was still approaching the distressed vessel, did not divert a commercial tanker that was only five miles away at the time to assist in the rescue. *Id.* Had the Coast Guard correctly handled the vital information provided by the rescue plane, it could have diverted the nearby tanker which likely would have saved the crew in distress. By the time the error was discovered and the correct information relayed, it was too late to save the crew in distress *Id.* at 235. In finding the government liable, the Court clarified that "[w]e are not here dealing with knowledge acquired by hindsight," and that this mismanagement was due to the negligence of operators on shore in failing to evaluate and pass on vital information. *Id.* at 328.

This passed muster under the "worsening" proong requirement of the Good Samaritan doctrine finding that had the endangered crew member's families, or the crew of the nearby commercial tanker, known that a Coast Guard vessel was incorrectly identified as approaching the vessel in distress, they may have effectuated a separate rescue effort. *Id.* However, the potential rescuers' "[i]gnorance of these facts and continued reliance upon the Coast Guard's celebrated skill made independent action unnecessary. But it reasonably kept them from taking action which, in all probability, would have been successful." *Id.* at 329.

Similarly here, upon information and belief, Daniel Avena alleges he provided the Coast Guard with the correct name of the vessel in distress, the F/V CONCH'RD, at 2:09 p.m. ECF No. 33, ¶¶ 62-63; ECF No. 34, ¶¶ 62-63. Instead of making note of this critical information, the Coast

-21-

Guard instead began making marine broadcasts stating it was the GOLD RUSH II in distress, and not the CONCH'RD. Had other possible good Samaritans in the area around Cape May known that the true vessel in distress was the CONCH'RD,  it is likely they would have independently provided assistance and saved Mr. Greenberg. To support the proposition that at least one good Samaritan would have come to the aid of the CONCH'RD,. Claimant's Amended Complaint, ¶ 49, states:

> 49.   Fishermen working on the water near CONCH'RD's location have stated that had a Coast Guard urgent marine broadcast been made that it was the CONCH'RD that was the vessel in distress based on the signaling from the EPIRB associated with it, they could have and would have gone to the aid of the vessel, and would have had sufficient time to arrive and save the life of Aaron Greenberg. However, because urgent marine broadcasts between 2:09 PM and 2:40 PM were stating that the vessel in distress whose EPIRB was signaling was the GOLD RUSH II, not the CONCH'RD, those potential good Samaritans, who could have saved and would have saved Aaron Greenberg, took no action upon hearing the messages. This is because they were not familiar with a fishing vessel GOLD RUSH II, nor would they have known where that vessel generally would have been on the open ocean. However, if the broadcasts had been about the CONCH'RD being the vessel in distress, these fisherman would have known the boat, its operators and where was the likely location where it would have been working, as it was known to be a 'conch boat." Those fisherman working on the water could have and would have stopped working and gone to provide aid and assistance to the CONCH'RD and its crew, including Aaron Greenberg.

ECF No. 33, ¶ 49. The truth of those statements at the pleading stage must be accepted.  Thus, even if just one fisherman working in the ocean  knew of the CONCH'RD's location and crew and would have gone to the vessel's rescue had the Coast Guard broadcasted correctly that the CONCH'RD, not the GOLD RUSH II, was in distress, Mr. Greenberg likely would have been saved.  This is very similar to *Gavagan*. The failure by those ashore to make note of, and pass on the vital information of which boat was in distress  at minimum, creates a question of fact as to whether the Coast Guard worsened the position of Aaron Greenberg.

**B.     Coast Guard Addendum Policies Required, at the Moment the CONCH'RD's General Location Information was Received to Launch Suitable Aircraft to Find It**

The Coast Guard's Addendum Policies required, at the moment the CONCH'RD's general location information was received, to launch suitable aircraft to find it. The United States wrongly suggests differently by referencing *Lane v. United States,* 2020 WL 1427419 (D. Mass. 2020), where it was also argued that the Coast Guard should have launched a helicopter to rescue mariners in the water. *Id.* at 7. There however, the plaintiff failed to point to any "statute, regulation, or written internal policy" requiring the Coast Guard to launch the helicopter earlier and only cited to the testimony of a Coast Guard officer that its typical practice would be to respond with a helicopter when persons are "in the water." *Id.* In finding against the plaintiff, the Court reasoned that "[w]ith twenty-twenty hindsight, one could disagree with the decision not to launch the helicopter sooner, as soon as the men were ordered to leave the ship and enter the water. However, the decision about when to assign the helicopter falls squarely within the discretionary immunity function." *Id.* at 8.

Here, however, like in the *Gavagan* case, knowledge of the events is not being "acquired by hindsight," rather, claimant alleges the Coast Guard's failure to abide by clear Coast Guard Addendum Policies, specifically Policy 3.4.4.2(2)(b), requiring the Coast Guard, after receipt of the general location of a transmitting EPIRB, to deploy an aircraft. Here, that transmission was received at 2:30 p.m. Unlike in *Lane*, here there is a clear, written internal policy of the Coast Guard that required an earlier response than it performed. Furthermore, the cases cited by the U.S. do not analyze situations covered by unambiguous language dictating the specific response procedure which the Coast Guard failed here to follow, such as the language found in Policy 3.4.4.2(2)(b), requiring "[w]hen only general position information is available, suitable aircraft should be launched to

-23-

direction find on the 406 MHz beacon's signal." *See Turner v. United States,* 869 F.Supp.2d 685 (E.D.N.C. 2012), *aff'd,* 736 F.3d 274 (4th Cir. 2013) *(*Plaintiff did not allege non-discretionary acts leading Court to grant summary judgment to the United States for failure to assert subject matter jurisdiction); *Azille v. United States*, 2008 A.M.C. 2820 (D.V.I. Nov. 13, 2008) (without discussing clear non-discretionary policies within the Coast Guard Addendum and citing only to the discretion held by the Coast Guard, the Court dismissed finding sovereign immunity and lack of subject matter jurisdiction); *Lewis v. United States*, No. 3:01-cv-821, 2002 WL 34104078 (M.D. Fla. Nov. 6, 2002) (Plaintiff only alleged discretionary Addendum policies that used ambiguous language to which Court found the decisions by the Coast Guard according to these policy were protected by immunity).

Approximately 18 minutes were lost by the Coast Guard not deploying aircraft until an actual fixed location was ascertained. As stated in *Muniz-Rivera*, conduct is non-discretionary "if a federal statute, regulation, or policy specifically instructed federal officials to follow a specified course of action." *Muniz-Rivera*, 326 F.3d at 15. Here, the exemption does not apply because a concrete policy was violated.

The Coast Guard Addendum Policy 4.1.6.1 required the Coast Guard to treat this case as being in the "DISTRESS" phase because there was a question as to the degree of danger to persons or property. As a result, Policy 4.1.6.2 makes clear that for cases in the "DISTRESS" emergency phase, Coast Guard or Coast Guard Auxiliary resources are required to "[r]espond immediately if able." Last and most importantly, Policy 3.4.4.2(2)(b) & (c) outlines the required response to EPIRB signal cases and states that "[w]hen only general position information is available, suitable aircraft should be launched to direction find on the 406 MHz beacon's signal." After the determination that

-24-

this is a 'DISTRESS' phase situation, each step in the timeline was a clear directive leaving no element of discretion. *Kim,* 940 F.3d 484. While other steps may have remained up to the discretion of Coast Guard personnel the Coast Guard Addendum Policy clearly outlined the requirement that suitable aircraft should be launched to the EPIRB's direction once the general location was ascertained.

Claimant asserts that around the time of these events, a Coast Guard helicopter was already in the air, performing law enforcement activities in the area where the CONCH'RD had capsized. ECF No. 33, ¶ 43. Since the moment the Coast Guard received the EPIRB's general location signal at 2:30 p.m., it was required by Addendum Policy 3.4.4.2(2)(b) to send suitable aircraft to the area, including the one that was already there.  Similar to the commercial tanker that could have assisted in *Gavagan,* the Coast Guard knew the helicopter was in the area, and should have sent it to assist in the search. *See, Gavagan,* 280 F.2d at 325.

The Coast Guard Addendum Policy 3.1.1 on Page 3-3 states that "[t]he condition of those in distress and the probability of continued survival degrades the longer assistance is delayed. Therefore, it is essential to reduce the time spent searching whenever possible." CG Addendum 3.1.1 SAR Incidents Overview, Page 3-3. In waiting until receiving the exact location at 2:48 p.m., the Coast Guard immensely delayed its rescue response. The nearby Coast Guard helicopter could have begun a search of the general area at 2:30 p.m. In the alternative, the extensive pre-flight procedures could have been initiated for the Coast Guard helicopter at Air Station Atlantic City at exactly 2:30 p.m. Either decision would have fit within the Coast Guard's required Addendum Policy and would have effectuated a faster response to the men suffering in the freezing water.

## **CONCLUSION**

Every single second counted in the rescue of Aaron Greenberg  and had the Coast Guard not mismanaged vital information or had they responded earlier as the Coast Guard Addendum Policy required, it likely would have arrived before he slipped from the hull of the CONCH'RD into the abyss. The above amounts to–at minimum–a question of fact as to whether the Coast Guard's mismanagement of vital information and failure to follow clear, non-discretionary procedure amounted to a violation of its duties to Aaron Greenberg to attempt his rescue non-negligently.

For the reasons set forth above, Third-Party Defendant United States' Rule 12(c) and Rule 12(h)(3) Motion to Dismiss should be denied.

Dated: April 18, 2022                                HOFMANN & SCHWEITZER
           Raritan, New Jersey                     Attorneys for Third-Party Plaintiff


By:_____
           Paul T. Hofmann
           1130 Route 202 South, Ste. 7A
           Raritan, New Jersey 08869
           Tel: 908-393-5662
           Fax: 212-465-8849
           paulhofmann@hofmannlawfirm.com