**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

IN RE:  COMPLAINT OF ADRIAN      CIVIL ACTION NUMBER:
AVENA AS OWNER AND AA
COMMERCIAL, LLC AS OWNER PRO     21-cv-00515-KMW-EAP
HAC VICE OF THE FISHING
VESSEL CONCH'RD, FOR             Motion
EXONERATION FROM OR
LIMITATION OF LIABILITY
--------------------------
KIMBERLY WOLFE, AS PERSONAL
REPRESENTATIVE OF THE ESTATE
OF AARON GREENBERG, AND ON
BEHALF OF KG, OVER WHOM
KIMBERLY WOLFE IS THE
APPOINTED CO-GUARDIAN, AND
WHO IS THE SURVIVING MINOR
CHILD OF THE DECEDENT, AARON
GREENBERG,

     Third-Party Plaintiff,

 v.

DANIEL J. AVENA, THE UNITED
STATES OF AMERICA, CM HAMMAR
AB and REVERE SURVIVAL,
INC.,

     Third-Party Defendants.
--------------------------
ADRIAN AVENA and AA
COMMERCIAL, LLC,
     Third-Party Plaintiffs,

 v.

CM HAMMAR AB and REVERE
SURVIVAL,
     Third-Party Defendants.

Sharon Ricci, Official Court Reporter
sharon.ricci.usdcnj@gmail.com
267-249-8780
Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

```
 1          Mitchell H. Cohen Building & U.S. Courthouse
 2          4th & Cooper Streets
            Camden, New Jersey  08101
 3          November 2, 2022
            Commencing at 12:51 p.m.
 4
    B E F O R E:              THE HONORABLE KAREN M. WILLIAMS,
 5                            UNITED STATES DISTRICT JUDGE

 6  A P P E A R A N C E S:

 7          REEVES McEWING, LLP
            BY:  MARY REEVES, ESQUIRE
 8          1004 S. Front Street
            Philadelphia, PA 19147
 9          For the Plaintiffs Avena and AA Commercial

10          HOFMANN & SCHWEITZER
            BY:  PAUL T. HOFMANN, ESQUIRE
11          1130 Route 202 South, Suite A7
            Raritan, NJ 08869
12          For the Plaintiff Wolfe

13          DEPARTMENT OF JUSTICE - CIVIL DIVISION, TORTS BRANCH
            AVIATION, SPACE & ADMIRALTY LITIGATION
14          BY:  BRADLEY J. PREAMBLE, ESQUIRE
                 JARED HOOD, ESQUIRE
15          P.O. Box 14271, CIV-T-ASA
            Washington, D.C. 20044
16          For the Defendant United States of America

17          MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN
            BY:  JAMELE A. HAMAD, ESQUIRE
18          88 Pine Street, 21st Floor
            New York, NY 10005
19          For the Defendant CM Hammar

20          CIPRIANI & WERNER, P.C.
            BY:  MICHAEL D. NOBLETT, ESQUIRE
21          485(E) Route 1 South, Suite 120
            Iselin, NJ 08830
22          For the Defendant Revere

23          TESTA HECK TESTA & WHITE, P.A.
            BY:  STEPHEN E. PARREY, ESQUIRE
24          424 West Landis Avenue
            Vineland, NJ 08360
25          For the Defendant Avena
```

*United States District Court*
*District of New Jersey*

1              (PROCEEDINGS held in open court before The Honorable

2    Karen M. Williams, United States District Judge, at 12:51 p.m.)

3              THE COURTROOM DEPUTY:  All rise.

4              THE COURT:  Good afternoon.  You can all be seated.

5              MS. REEVES:  Good afternoon, Your Honor.

6              THE COURT:  We're here this afternoon in the matter In

7    Re Avena, 21-cv-515.

8              May I have appearances of counsel, please.

9              MS. REEVES:  Counsel for the limitation plaintiff,

10   Lisa Reeves, from Reeves McEwing.

11             THE COURT:  I am sorry, say it again?  Counsel for

12   who?

13             MS. REEVES:  The plaintiff, the limitation plaintiff,

14   which is the vessel owner.

15             THE COURT:  Okay.

16             MR. HOFMANN:  Good afternoon, Your Honor, Paul Hofmann

17   of Hofmann & Schweitzer.  I represent the estate that's a

18   claimant in the limitation proceeding and a third-party

19   plaintiff against the various other defendants, including the

20   United States.

21             MR. PREAMBLE:  Good afternoon, Your Honor, Bradley

22   Preamble on behalf of the United States as third-party

23   defendant.

24             And with me here also is Mr. Jared Hood from the

25   claims and litigation group at the United States Coast Guard.

1     MR. HAMAD:  Good afternoon, Your Honor, Jay Hamad from

2     Marshall Dennehey on behalf of CM Hammar, third-party

3     defendant.

4     MR. NOBLETT:  Good afternoon, Your Honor, Michael

5     Noblett with Cipriani & Werner on behalf of Defendant Revere

6     Survival.

7     MR. PARREY:  And good afternoon, Your Honor, Stephen

8     Parrey, the Law Offices of Testa Heck Testa & White, here on

9     behalf of Defendant Daniel Avena.

10    THE COURT:  Thank you.  We're here this afternoon for

11    two motions.  The first I want to address is the motion to

12    dismiss filed on behalf of the government.

13    I'm not sure who wants to take that argument.  We'll

14    start there.  Your motion.

15    MR. PREAMBLE:  Thank you, Your Honor.

16    May I use the podium, please?

17    THE COURT:  Yes, you may.

18    MR. PREAMBLE:  May I proceed?

19    THE COURT:  Yes, please.

20    MR. PREAMBLE:  Good morning, Your Honor.

21    The United States has filed a motion to dismiss in

22    this case which we are here today for oral argument.  And as a

23    matter of formality first, the United States, if the Court

24    finds it necessary to make the request to reserve any time for

25    rebuttal after the other parties have had an opportunity to

1    make their arguments.

2            THE COURT:  Sure.

3            MR. PREAMBLE:  Thank you.

4            The United States has presented both an opening brief

5    and a reply brief that addresses a great deal of the arguments,

6    and I'm sure the Court is prepared on that, so I'd like to just

7    jump in and address a point that really wasn't covered as well

8    in the briefs, and that is whether or not the discretionary

9    function exception applies to one of the allegations that have

10   been set forth by the plaintiffs.

11           And that allegation is essentially the failure of the

12   Coast Guard to accurately and timely pass information

13   internally among Coast Guard personnel.  The limitation -- the

14   Plaintiff Kimberly Wolfe in this case has alleged that if the

15   vessel named CONCH'RD was communicated to the Coast Guard on

16   the first call from father, Daniel Avena, that the Coast Guard

17   mismanaged that information and did not timely pass it along to

18   its other internal stations, including sector Delaware Bay, and

19   that delayed the rescue.

20           The question is, is that conduct also covered by the

21   discretionary function exception?  And the answer is yes, it

22   is.  That conduct, as the Court is aware of, in the test under

23   *Gaubert* would be -- the United States would assert that the

24   challenged conduct there would be the duty to accurately and

25   timely pass information internally amongst Coast Guard

1  personnel.

2      Is there a mandatory duty on a part of the Coast Guard

3  that they have undertaken to do that, to pass that information

4  timely and accurately?  And the answer is no.  And that's true

5  both on the face of the complaint.  The plaintiffs have not

6  alleged that the Coast Guard policies, statutes, regulations,

7  or procedures compelled its employees to timely and accurately

8  pass essentially all information they may receive during the

9  collection or information-gathering stage.

10      So going on to Step 2 of that analysis, is this

11  untimely inpassing of information susceptible to policy

12  analysis?  And the answer there is, first, as *Gaubert* lays out,

13  first of all, the United States is entitled to a presumption

14  that it is susceptible to policy analysis.

15      Second of all, the plaintiffs have not alleged in

16  their complaint that their allegation of failure to timely pass

17  information was not susceptible to policy analysis at all.  So

18  really on its face of the complaint, the plaintiffs have not

19  alleged sufficient facts to establish subject-matter

20  jurisdiction in this case, not only for the issue of failure to

21  pass timely information internally, but of course, as was laid

22  out well in the briefs, as other courts have found repeatedly,

23  the issue of deploying an asset such as a helicopter or boat or

24  any other type of search and rescue asset to rescue somebody is

25  just something that is also covered by the discretionary

1    function analysis.

2         And there have been several cases on this point that

3    have laid out clearly why that's so, and the briefs have laid

4    that out as well.  And unless the Court has any questions on

5    that particular aspect, I would simply be fine with moving on

6    to other points.

7         THE COURT:  So I don't have any questions on this.  I

8    think the appropriate way to proceed on this oral argument is

9    on motion to dismiss for lack of jurisdiction, because if I

10   don't have jurisdiction, there's no point in reaching anything

11   else.

12        And so if you have any other points to be made about

13   whether or not, as I understand it, the Court lacks

14   jurisdiction because a claim of this nature could not be

15   maintained against a private party or because of discretionary

16   function, then I'm satisfied with the papers and your

17   additional argument this afternoon.

18        MR. PREAMBLE:  Okay.  Thank you.

19        And Judge Williams, if I may just make one

20   clarification that I wanted to be sure to address with the

21   Court, and that would be with respect to futility.

22        And that answer would be yes, this is futile.  It is

23   futile because not that there are facts here that they get a

24   chance to replead, okay.  What's bound here -- what binds the

25   plaintiffs in a discretionary function analysis is whether or

1   not there is a mandatory course of conduct that these Coast

2   Guard personnel were required to follow, and the answer to that

3   question is, for both of these allegations, no.

4           And so the United States would just conclude the

5   opening argument by asking the Court to dismiss this complaint

6   with prejudice.

7           Thank you.

8           THE COURT:  Thank you.  All right.  Who would like to

9   be heard first?

10          I have opposition from both, on behalf of Ms. Wolfe

11  and on behalf of Avena.

12          MR. HOFMANN:  Your Honor, Paul Hofmann on behalf of

13  Wolfe.

14          I'm sure Ms. Reeves has something else that she'll

15  probably clean up on certain points that I make, and of course,

16  she should have the opportunity to speak to you as well.

17          It seems to me from what Mr. Preamble has now said,

18  the government is all but, to my mind, conceding that their

19  motion here is premature except for a question of law, could

20  what the government failed to do and screwed up doing be

21  considered within discretionary function test?

22          Now, it's almost shocking to me that the government is

23  now -- is sort of saying here, from what he just said, that if

24  a member of the Coast Guard negligently or maybe even

25  intentionally failed to provide appropriate information

1    provided to them, that that could be considered a discretionary

2    act, and that there is some sort of public policy that would

3    protect a potentially gross misconduct on their part, gross

4    negligence.

5              One of the allegations here is Daniel Avena was spoken

6    to by the Coast Guard and said, look, that EPIRB that just went

7    off, it's not on the Gold Rush II, it's on my son's other boat,

8    the CONCH'RD, and they're fishing right off of here in Cape

9    May, please go rescue them.

10             But what does the Coast Guard do for the next half

11   hour?  It keeps broadcasting that it was on the Gold Rush II,

12   and that's in the -- that's in the pleadings.

13             Now, I've heard Mr. Preamble say that the pleadings

14   are not specific under the *Iqbal* test and, quite frankly, we

15   have laid out a specific timeline and described how and why the

16   government's response, the Coast Guard's response, failed.

17   Yeah, I didn't put in the word "Good Samaritan."  It's almost

18   as if those talismanic words need to be put into a complaint,

19   but they aren't.

20             We allege negligence.  And negligence implies and

21   infers and incorporates duty and a breach of duty, and that's

22   what we said occurred here.

23             As to his point as to whether there was a mandatory

24   violation, we put in -- and Your Honor has it as the search and

25   rescue addendum.  And if we go to that document, as we

1  described in our papers, there is language that the Coast Guard

2  itself says.

3       There's policy, which could be protected, and then

4  there's mandatory actions which have to be followed.  And

5  that's at the -- at page IV -- IV, Roman numeral IV, I believe,

6  of the document.  And it says, "Notice to readers."  And here

7  it says, by -- it talks about, first, what is the hallmark of

8  policy, which we would agree a policy decision is something

9  that, under the discretionary function, could be protected.

10 But then it says, "By comparison --," and I quote, "-- the

11 hallmark of doctrine is the use of the terms 'can' and 'may.'

12 They are permissive terms.  The term 'should' is a mandatory

13 term unless justifiable reason exists for not complying."

14      It says, "The hallmark of policy is the use of terms

15 'must' and 'shall.'  These are mandatory terms."

16      Now, we have shown within the SAR that there are

17 mandatory actions that should have been taken upon the EPIRB

18 first going off, and one of those is contained in rule -- and

19 I -- to get it correct, I will state, it's 4.1.2 (b)(2), I

20 believe it is, Your Honor, off the top of my head.  It's in the

21 document we submitted to Your Honor.

22      Counsel for the government doesn't even address that

23 issue.  He simply says, oh, the whole thing is not mandatory,

24 but the Coast Guard itself says this is mandatory, you shall

25 send out suitable aircraft upon receiving an EPIRB distress

1   signal.

2           And what is a distress signal?  Any signal that comes

3   from an EPIRB beak, and unless there's reason not to believe

4   that it was a distress signal.

5           So the argument that there's no mandatory rule flies

6   in the face of the case law that -- even as cited by the

7   government, that if there's a statute, rule, or regulation that

8   states that it's a mandatory function, then it has to be

9   followed.  They didn't do it here.

10          So we've got violations in two -- in three different

11  ways.  I've pointed out one where Mr. Preamble says, well,

12  maybe the internal communication among the Coast Guard, that's

13  a discretionary function.  Well, I hope that the Court wouldn't

14  buy that argument.  And the second is, they've failed to

15  provide the correct information for a half hour.  And the third

16  thing is, the distress signal was out and they failed to follow

17  their own rules that are mandatory.

18          Now, the fourth thing is, what we point out, is this

19  whole process of giving the wrong information -- and there's

20  case law, and one of the cases we cited to the Court is this

21  case from the -- I believe it is out of the Sixth Circuit, but

22  it's the *Gavagan* case.  And there's also the *Patentas* case

23  where actions by the Coast Guard, in and of themselves, which

24  are detrimentally relied on, could have affected the

25  possibility of the injured person being saved, could be found

1  to be a violation.

2          And in this case, we give specific facts.  And I can

3  represent to the Court, I have spoken to the witnesses, who

4  have specific knowledge that they -- that the broadcast that it

5  was the Gold Rush II did not alert them to the fact that the

6  CONCH'RD was the vessel in distress, and that they were out

7  fishing and they saw the CONCH'RD not far from where they were

8  fishing; and if, in fact, the broadcast that had been made had

9  said that it was the CONCH'RD that was in distress, they would

10 have gone to the rescue.  They knew the people on the boat.

11         This is questions of fact, Judge.  Here we are, we

12 haven't even started discovery, except for Rule 26 disclosures,

13 most of which are just, you know, vague and unresponsive, and

14 there's a lot to be found out here.

15         Now, it may turn out that the allegations we've made

16 do not rise to the level, but at this point, here on a Rule 12

17 motion, there's so much that is alleged that we believe Your

18 Honor should deny the motion and order us to proceed with

19 discovery.

20         THE COURT:  The policy that you attach, isn't there a

21 prescription on that policy and doesn't it -- the Coast Guard's

22 addendum search and rescue policy, in and of itself, in the

23 document itself, it reserves the discretion that is inure to

24 this entity.

25         And so I understand and I have read these papers

1   closely, and I understand that you have pulled out language

2   from the policy to support your argument.  My reading, though,

3   leads me to the conclusion that you have excluded the

4   prescription that is attendant to that policy, which is, this

5   is all subject to the discretion that inures to the benefit of

6   this organization.

7           I call it organization, but government.

8           MR. HOFMANN:  I understand what you're saying.  You're

9   talking about the Coast Guard.

10          I have to -- Your Honor, to -- essentially then when

11  it comes to anything that is done by the Coast Guard, based on

12  that reading, that because they say in one -- on one page they

13  say, oh, this is just policy, we're protected, and on another

14  page they say, this is what you shall do, I don't think that it

15  would be -- is appropriate for you as a decisionmaker to say

16  that one statement overrules another statement.

17          I think that you have to look at -- that you have to

18  look at the trees as well as the forest in this case.

19          THE COURT:  It's more than that, though, right?  They

20  have to -- in order for the government to agree to be sued,

21  give up their right to sovereign immunity, it has to be done

22  expressly.

23          And in doing that, in reaching that conclusion, I have

24  to look at a lot of things, and one of the things is in its

25  totality.  Correct?

1            And so we have here the Coast Guard agency -- I don't

2    know what you call it.  Department, maritime company.

3            MR. HOFMANN:  It's part of the Homeland Security now.

4            THE COURT:  Homeland Security.  Thank you.

5            We have the Coast Guard who is tasked with a number of

6    things, not just search and rescue.  Right?  They have -- it's

7    an organization.

8            And as an organization, it has to give guidelines and

9    guidance as to how the members of that organization, the crew,

10   the staff, the people in the boat, the people in the

11   helicopter, all the people who work for the Coast Guard, are to

12   conduct themselves in certain circumstances.

13           Explain to me how that guideline, those practices,

14   those policies and procedures transition to, oh, you can sue

15   me?  Because that's what you're talking about, they've given up

16   their sovereign immunity by virtue of the addendum to the

17   policy.  That's what I need to be convinced of.

18           MR. HOFMANN:  Well, Your Honor, first of all, the

19   jurisdictional grant doesn't come from the search and rescue

20   addendum; the jurisdiction comes from the Suits in Admiralty

21   Act and the Public Vessels Act.

22           So there's the federal jurisdiction against this

23   entity.  And --

24           THE COURT:  So but we're talking about the

25   discretionary function, right?

```
 1          MR. HOFMANN:  Right.

 2          THE COURT:  In order for the motion to dismiss to

 3    prevail on the jurisdictional issue, my understanding is that,

 4    number one, this action could not be maintained against the

 5    private entity.  Right?  That's the first thing.

 6          And number two, that the discretionary function

 7    exception doesn't apply.  So there's no duty.  Right?  That the

 8    Coast Guard's decisions about whether, when, or how to

 9    undertake the rescue are discretionary policy.

10          If they have those two things, then sovereign

11    immunity, they're entitled to sovereign immunity.  And your

12    argument, as I understood it from my reading of the papers,

13    your argument is, well, no, the discretionary function

14    exception doesn't apply, because you have in the opposition

15    papers attached the addendum search and rescue policy.

16          MR. HOFMANN:  If I may, Your Honor, because you raised

17    a couple things there that I think need to be addressed, and

18    the first is this issue about could a -- could the government

19    be sued for something that a private -- that a private

20    individual could not be sued for?

21          And that goes to the concept of the Good Samaritan

22    rule, which, in this case, is definitely applicable in that

23    once you undertake the rescue, okay, then that might bring in

24    the discretionary function.  But once you undertake the rescue,

25    you have to do it in a non-negligent way.
```

1          And that comes straight out of the case law and also

2     out of the restatement.

3          THE COURT:  So what is it you propose that I determine

4     that they undertook the rescue?

5          MR. HOFMANN:  I think that the SAR itself gives you a

6     clue, and that is certainly -- and I think that Mr. Preamble's

7     arguments in his papers conflate the issue of information

8     gathering versus information dissemination.

9          The SAR, and we point it out in our brief, says that

10    once that information is obtained, you shall broadcast -- and

11    that's in -- if you give me a second, I could find that

12    provision.  It says, you shall broadcast.  It doesn't say you

13    may broadcast or use your discretion if you want to broadcast.

14    It says, if it's in distress, you shall broadcast.

15         So there are rules -- and this -- and yes, this unit's

16    design and their function is to do searches and rescues, this

17    part of the Coast Guard.  Maybe there's other parts that deal

18    with water pollution, but we're not dealing with that section.

19         We're talking about the people who are tasked in this

20    area to do searches and rescues.  And the rules that they have

21    say once you have that information, you shall broadcast.  That,

22    to me, is what you should find is the beginning of the search

23    and rescue that occurred here.

24         And once they started that, they have to do it

25    non-negligently.  So once that private Good Samaritan says I'm

1 going out there, I'm taking my boat out there, and if he runs

2 over a person in the water, that person is then liable to be

3 sued.  If he had chosen not to go out, he can't be sued.

4          But here, the government followed its rules, and its

5 rules say once you have that information, that's the beginning

6 of the search and rescue.

7          So I hope I've answered your question at least as to

8 our position as to when it commenced.  And the government, as I

9 said, conflates, and they were trying to make you think, oh, we

10 were gathering information.  When they're broadcasting the

11 wrong boat name for a half hour and purportedly even having

12 been told that that's not the name of the boat?

13          That's not to me discretion, and I think that at that

14 point, Your Honor, at least for purposes of ferreting out the

15 information, you should deny the motion.  Maybe not to the

16 point where they could not ever remake it, of course, but at

17 this point, there's too much out there that I believe we have

18 presented to you to say deny the motion, let's get discovery,

19 let's see what all the facts were.

20          THE COURT:  To reconcile your position with two cases,

21 *Matter of Moore*, 488 F. Supp. 231, and *Azille vs. United*

22 *States*, DVI November 13 -- I am sorry, 2008 Westlaw 4911205.

23 The reason I ask you to reconcile those two cases with your

24 argument is those two cases both hold that this SAR, that

25 you're relying on, does not destroy the discretionary function

1  exception.

2          MR. HOFMANN:  Having looked at those cases a while ago

3  when we briefed them, my take on them was that the Court said

4  the SAR does not -- you can't rely on it because the plaintiffs

5  or the claimants in those cases did not specifically point to

6  any provisions within the SAR that might apply to the specific

7  facts of the case, and whereas we did the task of reading every

8  provision specifically related to this failed search and rescue

9  and we believe that that's why those cases are distinguishable,

10  Your Honor.

11          THE COURT:  Thank you.

12          MS. REEVES:  May I address the Court for the

13  plaintiff?

14          THE COURT:  You may.

15          MS. REEVES:  Thank you.  And I'll just stay here, if

16  you don't mind?

17          THE COURT:  Wherever you feel comfortable.

18          MS. REEVES:  To address the discretionary function

19  issue and the jurisdiction, I think Your Honor hit the nail on

20  the head about the communications as to when did the search and

21  rescue undertaken efforts by the Coast Guard begin?

22          Was it the first boat send out?  Is it the first

23  urgent marine broadcast?

24          THE COURT:  Before we go too far down this path, I

25  think the discretionary function exception applies to when,

1  where, how, whatever they do in this process, so I don't want

2  to parse out because I say "when."  The question is really one

3  of inquiry.  When do you think this happened?

4         I don't know if it's of any moment.  Because if the

5  entire process is protected, does the when even matter?

6  Because I think you're about to argue to me about when as

7  though it's dispositive of this issue, and I don't think it is.

8         I think that the discretionary function exception --

9  and perhaps I am reading this far too broadly or narrowly for

10  your liking, for your arguments really, but I read this as

11  giving up a fair amount of discretion to these agencies.

12         And I say "to these agencies" because the Coast Guard

13  is not the only agency I deal with in federal court.  So -- I

14  always -- you know, sometimes forget which agency is it, but

15  this is the Coast Guard.

16         I read this as being a big hurdle to overcome in a

17  matter like this.  And I'm not alone.  I've read a lot of cases

18  to tell me that I'm not alone in my interpretation of this

19  particular principle.

20         MS. REEVES:  Well, if I could respond, Your Honor.

21  With all due respect, we all agree that the Coast Guard has

22  absolutely no duty to search for anyone or rescue anyone, none.

23  They could sit in their Coast Guard cutter and watch someone

24  drown in front of them.  It might not be nice --

25         THE COURT:  Well --

1          MS. REEVES:  -- but it's not actionable.

2          THE COURT:  Well, I wouldn't say that.

3          MS. REEVES:  No, they wouldn't, but honestly there

4    would be no liability if they didn't try to help the person.

5    That's what the law says.

6          However, the discretionary function says it's

7    discretionary to decide whether or not they're going to attempt

8    to search and rescue.  But once they start the process and

9    decide to do a search and rescue, they have to do so with

10   reasonable care.

11         That's *Matthews*, that's *Indian Towing*, that's *Albinder*

12   -- I'm not sure I'm pronouncing it very well -- and I can, you

13   know, give you the cites, if you'd like.  These are all in the

14   briefs.  Kerowski(PH).  And there's numerous cases, Your Honor,

15   where the government's liability during a search and rescue

16   isn't limited to dropping the victim out of the helicopter or

17   running him over with a boat, it's also if there's negligence

18   in the process of search and rescue that worsens the victim's

19   position, then there is liability.  And I mean, there's a lot

20   of cases on this, Your Honor.

21         And I'm not going to tell you when the search and

22   rescue was launched, whether it started with the communications

23   or not, because that is a question of fact.  And there's case

24   law throughout saying that it's a question of fact.

25         There's *Hurd vs. The United States* out of the --

```
 1              THE COURT:  Tell me why Hurd differs from this case.
 2              MS. REEVES:  Why it differs?
 3              THE COURT:  Why it differs.
 4              Did you find anything in Hurd that differs from the
 5    facts -- and again, here we're in the pleadings stage, I get
 6    that.
 7              What's the difference with Hurd and this case?
 8              MS. REEVES:  Well, in Hurd, the Coast Guard was liable
 9    because during the search and rescue they terminated the search
10    too early, before sunrise, and that worsened the position of
11    the people in the shipwrecked boat and they were found -- the
12    United States, the government was found liable.
13              And that was, again, out of the -- well, you know it.
14    It's from the --
15              THE COURT:  So is it the undertaking -- the Coast
16    Guard -- see, this is my issue here.  I think it's
17    undisputed -- let me get these facts correct.
18              There's a conversation between Coast Guard and --
19    because I can't get the name straight.
20              MS. REEVES:  Daniel Avena.
21              THE COURT:  I'm going to say "dad."
22              MS. REEVES:  Dad.
23              MR. HOFMANN:  Okay.
24              THE COURT:  The conversation between the Coast Guard
25    and dad.  Right?
```

```
 1              MS. REEVES:  Correct.

 2              THE COURT:  There's a dispute about whether or not the

 3    device and the location of the device is identified as being on

 4    the CONCH'RD or the Gold Rush.  Right?  There's a dispute about

 5    that.

 6              MS. REEVES:  The -- well, not really.  The EPIRB, the

 7    device, was registered to the Gold Rush, a pleasure vessel that

 8    was owned by dad.

 9              THE COURT:  Okay.

10              MS. REEVES:  As soon as it went off and the Coast

11    Guard got the signal, I believe it was the Coast Guard, they

12    called Mr. Avena -- right? -- because there's a phone number

13    with the registration.

14              It's our position that Mr. Avena will -- Daniel Avena,

15    dad, will testify, I told him -- they said, is it a false

16    alarm?  No, he said, that is on my son's CONCH boat, and he's

17    fishing right now, this is not an alert, he's in trouble.

18              That is, you know, our position.  It's a fact

19    question.

20              THE COURT:  But it's -- isn't the device on the wrong

21    boat and that's undisputed?

22              MS. REEVES:  Correct.

23              THE COURT:  That EPIRB is registered to the Gold Rush.

24              MS. REEVES:  Correct.

25              But if Mr. Avena, as we contend, Daniel -- dad, I'll
```

1   say "dad."  If dad -- the device goes off, the Coast Guard gets

2   the signal, they call dad because they have the registration

3   stuff.  And dad says, no, it's not on my boat, the Gold Rush,

4   it's on the CONCH'RD, my son's CONCH boat, and he's out at Five

5   Fathoms, which is a known location -- I couldn't find it, but

6   apparently among fisherman -- off of Cape May, he's out there

7   and he must be in trouble.  So the first part is irrelevant in

8   my mind.

9           THE COURT:  That's the dispute, perhaps, right?

10          MS. REEVES:  Right.

11          THE COURT:  This is the dispute, Coast Guard saying

12   they didn't say it was on the CONCH'RD, he never said anything

13   to me about which boat it was on, and we have it registered to

14   the Gold Rush and that's the -- that's what we did.  Right?  So

15   that's the dispute of fact.

16          MS. REEVES:  But they eventually changed it to the

17   CONCH'RD.

18          THE COURT:  Because there's a second conversation.  As

19   I understand the pleadings and the facts in this case, there's

20   a second conversation with dad.

21          MS. REEVES:  But those are facts.

22          THE COURT:  Are they in dispute --

23          MS. REEVES:  Yes.

24          THE COURT:  Are they part of the pleadings right now?

25          MS. REEVES:  No, Your Honor.  We don't say there was a

1    second conversation and he didn't say -- the CONCH'RD and the

2    first one.  You have to accept all our -- with respect, you

3    have to accept the claimant's third-party complaint facts as

4    true and you have to accept our -- the plaintiff's facts as

5    true in our cross-claim.

6              And, you know, there's facts all over --

7              THE COURT:  What is the import?  Just because there's

8    a dispute in fact does not relegate this motion to be denied.

9    Motions to dismiss at the pleading stage are rare, I understand

10   it.  I totally embrace that.  I very rarely do them myself.

11             But in this case, given the breadth of sovereign

12   immunity, is this the case, with even these facts, that the

13   motion to dismiss should be denied?  Because the facts that

14   you're pointing to I don't know change anything about the

15   analysis as to whether or not there's subject-matter

16   jurisdiction.

17             That's the mental gymnastics I'm doing with this.

18   Because I understand there's a factual dispute.  I don't know

19   that that matters when the Court is required to first determine

20   whether or not there's subject-matter jurisdiction.  And the

21   bases for subject-matter jurisdiction don't necessarily rise

22   and fall on either of these conversations or one conversation

23   or both conversations.

24             Those -- it covers them, Coast Guard, for these very

25   types of situations where they are contacted, or not, to

1  conduct a search and rescue.  At its core, that's what this

2  case is about.

3         And don't for a minute think it's lost on me that a

4  life was lost here.  I get that completely.  Put that aside for

5  a minute.

6         Who's responsible?  Because that's what we're talking

7  about.  And in order for the Coast Guard to be responsible for

8  that, you've got to give me why I have subject-matter

9  jurisdiction.  And if your sole basis for that are these phone

10 calls or this phone call or these pleadings, I'm not certain --

11 I've not been convinced thus far that you've met that standard.

12        Because the entire thing is search and rescue.  It is

13 the very thing that divests this Court of subject-matter

14 jurisdiction.

15        MS. REEVES:  Your Honor, there are multitudes of cases

16 where Coast Guard made a mistake in communications internally

17 and to the public or other people during a search and rescue

18 and was an -- either led to liability or it didn't, but it was

19 an issue of fact.

20        THE COURT:  During the search and rescue.

21        MS. REEVES:  Yes.

22        THE COURT:  I don't know that this happens during the

23 search and rescue.

24        MS. REEVES:  Well, if I could, Your Honor, there are

25 also multiple cases, including *Hurd vs. The United States,*

1   where it says whether the Coast Guard has attempted or started

2   the search and rescue is a matter of fact.  And that's the

3   appellate decision.

4          But the underlying decision that was affirmed, here is

5   the -- one of the findings of fact of the judge, because it was

6   a bench trial, of course:  After a trial gathering information

7   is part of the SAR process.  A Coast Guard rescue involves more

8   than simply putting a boat in the water.  Aiding someone in

9   distress is a continuum.  It has a beginning, a middle, and the

10  end.  It's an evolving process.  The first step is gathering

11  information, evaluating it, and finally, deciding the

12  appropriate resource, et cetera, et cetera.

13         Based on that judge's, in the District of Ohio, I

14  think, finding of fact in that case, he found that, indeed, the

15  search and rescue started with the communications -- *Hurd* was

16  all about miscommunications, as I recall -- not *Hurd* wasn't.

17  But the other case that I can never pronounce, *U.S. vs.*

18  *Gavagan*, out of the Fifth Circuit, it's the same -- it's

19  incredibly similar that the improper, you know, communications

20  caused other mariners and vessel owners to stand down, thinking

21  the vessel was safe, and therefore, there was liability on the

22  Coast Guard there.

23         That's -- this would be my whole argument, Your Honor,

24  not based on the SAR manual, but I think we all agree -- the

25  Coast Guard agrees that once they initiate a rescue response,

1    they have to do it with reasonable care.

2         When the search and rescue was launched is a question

3    of fact.  That's *Hurd*, that's *Sandra & Dennis Fisheries*,

4    *Deravin*, the case I just mentioned, *Gavagan*, the *Turner* case.

5    And, in fact, all of the cases that the -- most of.  I

6    shouldn't say that.  And it's in my brief.

7         The cases relied on by the United States in their

8    brief were decisions of the district court after a bench trial,

9    during which facts were determined, or on summary judgment,

10   after the close of discovery.  That's *Turner*, that's *Sagan*,

11   that's *Bunting*, that's *Sandra & Dennis Fishing Corp and*

12   *Albinder*.

13        It's -- you know, I think that in this case this is

14   premature.  You know, perhaps we should revise our pleadings to

15   put the magic words in, but the issue of jurisdiction is

16   totally intwined with the issues under the Good Samaritan

17   Doctrine.

18        And the last point, Your Honor, is a private party

19   would be liable for these actions.  A private party,

20   Tow-Boats-R-Us, or even just a regular Good Samaritan not

21   looking for profit, if he learns that there -- I don't care how

22   he learned, from the EPIRB or from a phone conversation, that

23   it's the CONCH'RD, go get the CONCH'RD, Tow-Boat-R-Us.  It's

24   the CONCH'RD, we first thought it was another one, and it's out

25   by Fathom Banks.  And he says, yes, I'm going, I've got it,

 1  don't worry about it.

 2          And then if he tells his co-workers on a different

 3  boat to go somewhere else or he's the guy in the office, and

 4  the people die and nobody else has gone, they're liable, just

 5  like the government should be liable here.

 6          THE COURT:  Thank you.

 7          No one else needs to be heard, right?  No one else

 8  even chimed in on the papers.

 9          MR. HOFMANN:  All I'd like to point out, Your Honor,

10  is on page 4-10 -- and it just goes to --

11          THE COURT:  What are you referring to?

12          MR. HOFMANN:  Of the SAR.  When did the search and

13  rescue commence?  There's a block in bold that says, "Note, as

14  mentioned in 4.1.61, if a case is classified as distressed, the

15  Coast Guard shall respond immediately, if able, to include

16  broadcasting a UMIB and dispatching appropriate resources."

17          They didn't have the right, once they determined this

18  was a vessel in distress, to screw up, they didn't -- they

19  issued --

20          THE COURT:  But isn't -- I'm with you.

21          MR. HOFMANN:  Okay.

22          THE COURT:  Except this argument factually is ignoring

23  the device is on the wrong boat.  And that doesn't matter in

24  this analysis at all?

25          MR. HOFMANN:  You're assuming that the device is on

1    the wrong boat, but it's not necessarily true.  It may have

2    been on the correct boat, as was told to the Coast Guard.

3    That's what Ms. Reeves is trying to -- well, not trying to say

4    that she didn't express it, but the point is, she was pointing

5    out to you that it is intertwined.

6          If Mr. Avena, whose counsel is here, did say to the

7    Coast Guard on that first call, it's on the CONCH'RD, they're

8    fishing at the 40-fathom line, it's right off of Cape May,

9    please help, and the Coast Guard said we got it, we got it,

10   we're going to broadcast, we're going to go save those people.

11   They issue the broadcast that said the wrong boat.

12         Now, if that's not violating the rule that if a vessel

13   is in distress you're going to issue a broadcast and send

14   appropriate resources, including the other section I said,

15   which says, in a vessel in distress and you're not exactly sure

16   where it is, send a helicopter or airplane, some sort of flying

17   asset.

18         These are mandatory things that they're supposed to

19   do.  That's their function.  That's not their discretion

20   anymore if their rules say do this.  And if they do it in the

21   wrong way, they harmed and, respectfully, 30 minutes, we

22   believe, at least, were lost by them screwing around with the

23   wrong boat.  And if they had gotten out there, they could have

24   dropped a life preserver to my client's decedent and we

25   wouldn't be here today.

 1          Thank you, Your Honor.  I --

 2          THE COURT:  Mr. Preamble?

 3          MR. PREAMBLE:  May I use the podium?

 4          THE COURT:  Yes.

 5          MR. PREAMBLE:  Briefly.  Very briefly.  This is more

 6  for just clarification.  I understand the Court gets this.  And

 7  there are a couple things I want to address to be sure that we

 8  have the correct analysis here.

 9          The first is, the Supreme Court has made this clear

10  numerous times when it has addressed discretionary function

11  that it is not the status of the actor, it's the conduct that

12  we're looking at.

13          So there's discussion here about, well, discretionary

14  function doesn't apply anymore once the search and rescue's

15  underway.  That's not true.  That's not true.  It applies the

16  entire time.

17          The question, as the Supreme Court laid out, is, is

18  the conduct susceptible to policy analysis?  Is there elements

19  of judgment or choice that are involved here?  It doesn't

20  matter what the nature of the actor is, whether it's an

21  operational actor versus a policy planner actor.  The Supreme

22  Court got rid of that distinction a long time ago.

23          Second, there's a lot of discussion about undertaking,

24  Good Samaritan.  It doesn't matter.  When the Court is looking

25  at the discretionary function analysis, the negligence, duty,

1  Good Samaritan reliance, all the rest of it, it doesn't matter.

2          Discretionary function test, as articulated in

3  *Gaubert,* is a hypothetical question that the Court has to

4  address.  What's the challenged conduct?  Is there a mandatory

5  duty?  If there's not, is the conduct susceptible to policy

6  analysis?  The end.

7          The Court is right, that the policy has a huge

8  disclaimer on it.  In the *Matter of Moore*, Judge Grimm

9  understood that.  But even if that disclaimer was not there,

10 the very provisions that plaintiffs, the non-movants, have

11 cited throughout their response brief have language that is

12 qualified and indicative of an application of judgment.

13         4.1.5.1, immediate response shall be initiated if

14 feasible.  That is something that speaks to judgment.

15         Number 2:  4.1.6.1, the SMC shall take action

16 appropriate to the situation.

17         4.1.6.2, respond immediately, if able.

18         Somebody at the Coast Guard has to make a decision and

19 a judgment if they're able to.

20         Suitable aircraft, 3-4-4-2, bravo.  Suitable aircraft

21 should be launched.  That is not must be launched.

22         So even if you look at the challenged conduct and if

23 we were to say that this overarching policy, which the Coast

24 Guard and Judge Grimm has noted in *Matter of Moore*, even if

25 that didn't exist, the provision cited by the non-movants here

1    just simply are not mandatory.  So I wanted to make that point.

2         And then -- so there's just a lot of confusion going

3    on here with the non-movants about negligence and DF.  Two

4    different things, two separate questions.

5         And no, the Court does not need to decide when an

6    undertaking occurred here.  It's irrelevant to the analysis.

7         And just briefly, if I look over my notes, I think

8    that's all I have to say.

9         And just to answer the question about *Hurd*, my

10   understanding, just quickly reviewing that decision from the

11   Fourth Circuit, there are cases where the United States did not

12   raise the discretionary function exception.  I can't speak to

13   that.  But that's one difference, at least with the circuit

14   opinion.

15        And the *Gavagan* case, it's an early case from the

16   1960's, which again, we're not privy to, and I don't think that

17   opinion really addresses what the policies and procedures were

18   in play there.  And I do not believe, if I remember correctly,

19   the United States raised the discretionary function exception

20   in that case either, and in part because, most likely, in 1960,

21   the discretionary function law just hadn't developed to the

22   point it has now.

23        So again, unless the Court has any further questions

24   from the United States, we would just simply ask again for

25   dismissal with prejudice.

```
 1          THE COURT:  Thank you.

 2          MS. REEVES:  Could I make one request, Your Honor?

 3          THE COURT:  Sure.

 4          MS. REEVES:  I'm looking again at the U.S.'s brief.

 5   And it was based on --

 6          THE COURT:  On Document 58?

 7          MS. REEVES:  Document 58.

 8          As noted, claimant's theory of liability relate only

 9   to Coast Guard conduct before it undertook the rescue, et

10   cetera.  And, you know, we addressed that by saying, no, they'd

11   already undertaken it.

12          The point is, this is the first time that I'm hearing

13   it articulated that the whole search and rescue process is a

14   matter of policy.  I think the case law belies that.  But if

15   that -- that's obviously a focus here for this argument, and

16   I'd like a chance to address it because it really -- their

17   whole argument before was, well, he was dead before we put a

18   boat in the water and that's when it started, and so all this

19   other stuff doesn't matter, but now I'm hearing every decision

20   they make -- you know, to make a broadcast is or is not, you

21   know, policy -- and I know there's law on this.

22          Whether or not it's a policy judgment I think is an

23   issue of fact, Your Honor.  And I'm happy to submit law on it.

24          THE COURT:  So this -- there is some traction to this,

25   whether or not it's an issue of fact.  Right?  I do understand
```

1  that argument.  I probably understand it too keenly because

2  this is why granting motions to dismiss are rare.

3       Because I have rarely encountered the argument where,

4  oh, additional facts, if discovered, could dictate the outcome

5  of this issue.  Right?  I mean, that's really what you're

6  arguing -- right? -- there are facts out there that we can get,

7  that we can discover, that shows or helps us establish our

8  cause of action against the Coast Guard.  Yes.  Always.

9       The problem is, those facts, as I'm understanding this

10  process in the pleading, don't get me to the answer that I need

11  to get to with respect to the discretional function.  That's

12  the problem.

13       And I will tell you, I'm not -- and I'm not alone in

14  this.  This is the first time I've actually seen this in play.

15  Right?  So the briefing of the parties is really what we had

16  and our own research -- my law clerks are amazing.  We couldn't

17  even really find a really persuasive -- not persuasive, binding

18  case.  It's all persuasive.  The Third Circuit has not squarely

19  dealt with this.

20       MS. REEVES:  You're correct, Your Honor.

21       THE COURT:  And so I'm by myself.  I'm not afraid of

22  that, but I say that to say I'm confident where I'm going with

23  this.  And to the extent I'm wrong, someone will tell me.

24       MR. HOFMANN:  Well, I'll volunteer, Judge.

25       THE COURT:  Yeah, but I think you've done that

 1   already.  I think you've done that already.  And so I should

 2   say someone in a role that is actually going to have

 3   consequences to me will tell me.

 4           MS. REEVES:  Okay.

 5           THE COURT:  All right.

 6           MS. REEVES:  So no further briefing, is that your --

 7           THE COURT:  Yeah, no further briefing.  I think I'm

 8   good on this.  I do understand and appreciate your arguments,

 9   but I think they're without consequence.

10           Even if the facts could be discovered, I don't know

11   that that helps me with my analysis with respect to the

12   discretionary function.  I think that's where the case is

13   lacking.  But again, you know, it won't be the first time that

14   I understood incorrectly, and so I guess I'll find out if I'm

15   wrong.

16           So let me start by saying, as it relates to the

17   government's motion, the Court notes that the government's

18   jurisdictional challenge rests entirely on the pleadings.

19   Thus, the government's motion presents a facial attack

20   constraining the Court to only consider the allegations of the

21   complaint and the documents referenced therein and attached

22   thereto in the light most favorable to the claimants.

23           And so query whether or not I even can get to the,

24   what I'm calling SAR search and rescue policy.  But I figured

25   the workaround.  In any event, that proposition is supported by

1   Gould Electronics, Inc. vs. United States, 220 F.3d 169 at 176

2   (3d Cir. 2000).

3         Claimants invoke two statutes, the Suits in Admiralty

4   Act, 46 U.S.C. Sections 30901, et seq; and Public Vessels Act,

5   46 U.S.C. Sections 31101, et seq.  Under both of these

6   statutes, Congress has waived the government's sovereign

7   immunity, but only to the extent that a civil action in

8   admiralty could be maintained against a private person.  46

9   U.S.C. Section 30903.  See also *Patentas vs. United States*, 687

10  F.2d 707 at 715 (3rd Cir. 1982).

11        "Simply stated, this Court's subject-matter

12  jurisdiction pivots on whether the claims at issue could

13  hypothetically establish a tort law duty analogously applicable

14  to similarly-situated private parties."

15        Here, the claimants seek to hold the government liable

16  for certain alleged failures related to the Coast Guard's

17  procedures taken prior to undertaking the rescue of the

18  CONCH'RD; however, it is well-established principle of maritime

19  law that a private party is not incumbered by any duty to

20  rescue a person or vessel in distress.  Frank vs. United

21  States, 250 F.2d 178 at 180, (3d Cir. 1957).

22        Because a private party could not under analogous

23  facts be liable for the asserted claims, the Court finds that

24  the government has retained its sovereign immunity in this

25  case.  However, even assuming that the Coast Guard did owe such

1    a duty as claimants allege here, their claims would

2    nevertheless be barred by reason of sovereign immunity because

3    they have failed to establish the Coast Guard lacked discretion

4    in its search and rescue procedures.

5         An exception to sovereign immunity, the law recognizes

6    that the government may waive its immunity in instances where,

7    for example, the challenged conduct does not involve an element

8    of judgment or choice.  Stated differently, sovereign immunity

9    may be waived where either a statute, regulation, or policy

10   effectively eliminates, effectively eliminates a government

11   entity's discretionary function by compelling it to follow a

12   specific course of action.

13        The third-party plaintiff attaches to her opposition

14   papers the Coast Guard's addendum search and rescue policy,

15   which purportedly prescribes specific, non-discretionary

16   actions the Coast Guard must take when responding to maritime

17   emergencies.

18        Despite having never previously referenced, nor

19   attached this document to the pleading, I find that plaintiff

20   ignores the SAR policy's plain language, expressly that its

21   prescriptions are unconstrained and always subject to the Coast

22   Guard's discretion.  There's a disclaimer that is apparent on

23   the face of this document and the provisions cited come with

24   qualifications that suggest discretion to this Court.

25        "Further, numerous courts have found that this very

1  document and its guidance does not circumvent, much less

2  substitute itself for the judgment and sound discretion of the

3  Coast Guard."  See for example *Matter of Moore*, 488 F. Supp.

4  231, 239 through 40, District of Maryland, 2020.  In that case,

5  granting motion to dismiss on the basis that discretionary

6  function exception applied after reviewing the SAR addendum.

7          Also, in *Azille vs. United States*, 2008 Westlaw

8  4911205, DVI, November 13th, 2008, concluding that "The Coast

9  Guard's decision to search for plaintiffs and its judgments

10  about how to conduct the search were discretionary acts."

11         For all of these reasons, the Court finds that the

12  government is entitled to sovereign immunity based on the

13  claims in this matter.  As such, the government's motion to

14  dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) is

15  granted and all claims against it are dismissed with prejudice.

16         All right.  Tough stuff.  Took me a long time, my

17  staff a long time to kind of parse this through, but I landed

18  in my decision where I think this particular case led me.

19         And so with that, the next thing on the agenda is this

20  motion to amend, motion to amend or second amended complaint,

21  and there was one opposition on behalf of Revere.  However, I'm

22  going to dismiss that motion to amend as moot now because it

23  still names the Coast Guard -- or the United States of America.

24  So I think for all purposes, we need a new amended complaint.

25         In that, though, in saying that -- so motions to amend

1   the complaint are in the province of the magistrate judge in

2   our district.  And so usually they hold off deciding those when

3   there's a motion to dismiss that impacts the proposed motion to

4   amend, and so I don't want to be interpreted as stepping into

5   what we have magistrate judges handle, but there was some

6   arguments raised by Revere with respect to the wording in the

7   amended complaint that I trust can be worked out when you file,

8   I guess, the third amended complaint.

9          And so with that, unless there is an objection to me

10  rendering, by virtue of this decision, the second motion to

11  file the second amended complaint as moot, then I will do as

12  I've indicated and allow the plaintiffs 30, 60 days to file the

13  next proposed motion to amend.

14         So the only person that can oppose is counsel on

15  behalf of Revere, or Revere as one of the parties.

16         Any objection to that proposed course of action?

17         MR. NOBLETT:  No, Your Honor.

18         THE COURT:  So I'll leave that to the two of you.

19         Any objection to that proposed course, rendering the

20  second amended complaint as moot, giving you leeway to file

21  another complaint?

22         MS. REEVES:  I don't have a dog in this fight, so...

23         MR. HOFMANN:  Obviously, I understand the reasoning

24  because the -- it does -- the second amended or proposed

25  complaint has the government still in it, so it's got to come

```
 1   out.
 2           As to ruling on the change of language, I don't see
 3   why -- well, I guess you're saying that it's moot, but -- I --
 4           THE COURT:  No, what I'm saying is there's an
 5   objection to it based on Revere, and what I'm suggesting is
 6   that you all work that out before filing the next amended
 7   complaint.  I will not be deciding that.  That is in the
 8   province of the magistrate judge.
 9           MR. HOFMANN:  I see what you're saying, Judge.
10           THE COURT:  Yeah.
11           MR. HOFMANN:  We weren't able to work it out, so we're
12   just going to have to fight it out.
13           THE COURT:  Which is fine, but you're going to fight
14   that out by virtue of another amended complaint, because the
15   one that's currently filed is inoperable given my decision with
16   respect to the Coast Guard.
17           MR. HOFMANN:  Understood, Your Honor.  We'll have that
18   filed forthwith so we can move on.
19           We have a conference scheduled in a week from now with
20   the magistrate judge and we can -- we'll work things out as to
21   that.
22           But thank you, Your Honor.
23           THE COURT:  Yes, that conference is November 8th at
24   11:00 a.m.
25           MS. REEVES:  Yes, Your Honor.
```

1          THE COURT:  Thank you all.  Have a great day.  Take

2    care.

3          MS. REEVES:  Thank you, Your Honor.  You too.

4          MR. PREAMBLE:  Thank you.

5          THE COURTROOM DEPUTY:  All rise.

6          (Matter adjourned at 1:55 p.m.)

7

8          - - - - - - - - - - - - - - - -

9

10          I certify that the foregoing is a correct transcript

11    from the record of proceedings in the above-entitled matter.

12

13    */S/ Sharon Ricci, RMR, CRR*
     *Official Court Reporter*

14

15    *November 16, 2022*
          *Date*

16

17

18

19

20

21

22

23

24

25

*United States District Court*
*District of New Jersey*