HOFMANN & SCHWEITZER
*Attorneys for Third-Party Plaintiff Kimberly Wolfe*
1130 Route 202 South, Suite A7
Raritan, NJ 08869
Tel: 908-393-5662    Fax: 212-465-8849
paulhofmann@hofmannlawfirm.com

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
-------------------------------------------------------------------------x
IN RE: COMPLAINT OF ADRIAN AVENA, AS OWNER      **1:21-cv-00515(NLH)(MJS)**
AND AA COMMERCIAL, LLC., AS OWNER PRO HAC
VICE, OF THE FISHING VESSEL CONCH'RD, FOR
EXONERATION FROM OR LIMITATION OF LIABILITY
-------------------------------------------------------------------------x
KIMBERLY WOLFE, AS PERSONAL REPRESENTATIVE OF
THE ESTATE OF AARON GREENBERG, AND ON
BEHALF OF KG, OVER WHOM KIMBERLY WOLFE IS THE
APPOINTED CO-GUARDIAN, AND WHO IS THE SURVIVING
MINOR  CHILD OF THE DECEDENT, AARON GREENBERG,

           Third-Party Plaintiff,      **SECOND AMENDED THIRD-PARTY COMPLAINT**

     V.

DANIEL J. AVENA, THE UNITED STATES OF AMERICA[1],
CM HAMMAR AB, REVERE SURVIVAL, INC., and
SEA GEAR MARINE SUPPLY, INC.
           Third-Party Defendants.
-------------------------------------------------------------------------x

---

[1] While proceedings to have this Second Amended Third Party Complaint approved and be permitted to be filed were ongoing, the Court heard and decided the United States of America's motion to dismiss the causes of action asserted against it by Adrian Avena, AA Commercial and Kimberly Wolfe. In a decision and order entered on November 4, 2022, the District Court dismissed all claims against the United States on jurisdictional grounds.  A Notice of Appeal of that decision was filed on November 10, 2022. Because of the possibility that the appeal will be successful and the claims versus the United States could be reinstated as a result, the United States is continued in the caption, as are the previously asserted claims in the Second Cause of Action of the First Amended Third-Party Complaint. Upon the within pleading being filed, as a matter of procedure it became the operative complaint for all remaining parties. To the extent it is properly served all such parties are required to answer this pleading. So too for the additional named party, Sea Gear Marine Supply, Inc. Inclusion of the United States of America in this pleading, including the claims made against the United States, it is recognized, will only be operative if the dismissal of the United States is reversed on appeal. The inclusion herein of the United States is not intended to require any response by the United States to this pleading. Claimant Wolfe herein will abide by the Order of Dismissal vis a vis the United States unless and until the appeal currently pending is decided in her favor. If the claims are reinstated on appeal, service of the within pleading will be made upon the United States.

1

KIMBERLY WOLFE, as the Personal Representative of the Estate of AARON GREENBERG, brings the within Third-Party Complaint pursuant to FRCP Rule 14 against DANIEL J. AVENA, THE UNITED STATES OF AMERICA, CM HAMMAR AB, REVERE SURVIVAL, INC., and SEA GEAR MARINE SUPPLY, INC., as follows:

1. This matter is brought within the admiralty and maritime jurisdiction of the court, of the Federal Rules of Civil Procedure, and is also brought under the General Maritime Law of the United States as well as through the jurisdiction of 28 USC § 1333, this being a claim in excess of $75,000 exclusive of costs and interest and it being brought against completely diverse parties. As to the claims against the United States of America, if restored after the pending appeal, jurisdiction against the United States would be pursuant to the Suits in Admiralty Act, 46 U.S.C. §§30901 et. seq. the Public Vessel Act, 46 U.S.C. §§31101 et. seq. and the court's admiralty jurisdiction over claims brought for the negligence of the United States Coast Guard and/or other agencies of the United States.

2. The court also has jurisdiction pursuant to its pendent, ancillary and supplemental jurisdiction pursuant to 28 USC § 1367.

3. Reference is made to the complaint for exoneration from or limitation of liability filed in the proceeding entitled IN RE: COMPLAINT OF ADRIAN AVENA, AS OWNER AND IN PERSONAM AND AA COMMERCIAL, LLC., AS OWNER PRO HAC VICE, OF THE FISHING VESSEL CONCH'RD, FOR EXONERATION FROM OR LIMITATION OF LIABILITY, Civil Index No.: 1:21-cv-00515, filed within the United States District Court for the District of New Jersey on or about January 11, 2021.

4. Reference is also made to the answer and claim of KIMBERLY WOLFE, AS

2

PERSONAL REPRESENTATIVE OF THE ESTATE OF AARON GREENBERG, AND ON BEHALF OF KG, OVER WHOM KIMBERLY WOLFE IS THE APPOINTED CO-GUARDIAN, AND WHO IS THE SURVIVING MINOR CHILD OF THE DECEDENT, AARON GREENBERG, filed in the above-referenced limitation proceeding, the allegations of which are incorporated herein by reference.

5.   The claims asserted in this second amended third-party complaint arise from the same events that led to the filing of the above-referenced limitation action, to wit, the sinking of the F/V CONCH'RD, a 32-foot fishing vessel which, on December 3, 2020 capsized and sank with the loss of life of one of the vessels two crew members, to wit, Aaron Greenberg.

6.   In her answer and claim, Kimberly Wolf asserts claims, on behalf of the beneficiary of Aaron Greenberg's estate for the damages related to Aaron Greenberg's unpaid earnings pre-death, for the loss of life and conscious pain and suffering of Aaron Greenberg and the loss of support, and society to his beneficiary and all other damages allowed by law. She asserts that, in whole or in part, the wrongful death of Aaron Greenberg was caused by actions of Adrian Avena and or AA Commercial LLC.

7.   Third-party plaintiff herein now brings these additional claims for damages including for the survival causes of action and the loss of life of Aaron Greenberg against Daniel J. Avena, the United States of America, Hammar AB and Revere Survival, Inc. and Sea Gear Marine Supply, Inc. on the following causes of action.

3

## GENERAL STATEMENT OF FACTS

8.    Emergency Position Indicating Radio Beacons or EPIRBs are small, floatable devices used to alert search and rescue services in the event of an emergency involving, most often, a vessel capsizing or sinking. It does this by transmitting a coded message via the free-to-use, multi-national Cospas Sarsat network. SARSAT stands for Search and Rescue Satellite Aided Tracking, which is the U.S. developed program of the multi-national network. (COSPAS is a Russian acronym for its related program).

9.    Upon an EPIRB being activated a 406 MHz distress frequency signal is sent via satellite and earth stations to the nearest rescue co-ordination center which shunts the message to rescue authorities to process and react to. EPIRBs are installed on marine vessels and are registered through the national search and rescue organization for that specific boat.

10.   The registration with the national organization of an EPIRB with a particular boat allows faster confirmation of active emergencies distinguished from false alerts and helps provide for faster responses for responding agencies in a real emergency. EPIRBs can either be operated automatically after an incident by fitting them to an automatic release mechanism affixed to a vessel structure, whereby the EPIRB is released from its bracket once submerged, and allowing the unit's water contacts to activate an emergency signal, or EPIRBs can also be carried in bags and activated manually in an emergency.

11.   By law EPIRBs are registered to and to be designated to specific vessels. If an EPIRB is registered to a specific vessel, and then it is transferred to a different vessel, it must be re-registered upon installing it on the different boat.

12.   Commercial fishing vessels are required by law to carry EPIRBs. This is for good reason,

4

as the fishing industry is one of the most dangerous in the world, with an ever-present risk

of being swamped or sunk by dangerous seas, winds and tides.

13.     If an EPIRB activates and broadcasts an emergency signal, it generally means that a vessel

to which it is attached has capsized and/or sunk. In such case, it must be assumed that

there is a serious threat to the lives of those who were aboard the vessel. For that reason, it

is extremely important that EPIRBs be registered in the United States with National

Oceanographic and Atmospheric Administration (NOAA).

14.     Registration of EPIRBs is done with and at the NOAA National Beacon Registration

Database for U.S. coded beacons, part of the Search and Rescue Satellite Aided Tracking

System. Registration is required by law. Renewal of the registration is required on a

timely basis.  Transfer of an EPIRB from one associated vessel to a different vessel must

also be registered.

15.     Beacon registration is required by Federal regulations (Title 47 of the CFR , Parts 80, 87

and 95). Failure to register the beacon, or to notify the National Oceanic and Atmospheric

Administration (NOAA) of a change in beacon ownership, could result in penalties and/or

fines issued to the owner by the Federal Communications Commission. See

https://www.sarsat.noaa.gov/faq%202.html. (Last visited on November 5, 2021).

16.     The United States of America has a well-developed search and rescue system and protocol

for both shoreside events and marine events. The United States Coast Guard is the primary

agency of the United States for carrying out maritime searches and rescues on the

navigable waters of the United States.

17.     NOAA is an agency of the United States significantly involved with the system for

initiating and performing maritime searches and rescues. NOAA is the agency designated to receive EPIRB signals, process them, and communicate them to the United States Coast Guard so that the Coast Guard can take what it deems to be appropriate action to determine the validity of a distress signal and then to carry out a marine search and rescue if necessary. NOAA operates the nation's civil environmental satellites. These satellites, which are used to monitor weather, also carry instruments that detect 406 MHz emergency beacon broadcasts. As NOAA operates the satellites that carry search and rescue instruments, and operates the equipment to receive and process distress signals, it is the lead agency in the United States for the Cospas-Sarsat Program.

18.    Low Earth Orbiting Search and Rescue (LEOSAR) satellites can compute a location for a 406 MHz emergency beacon transmitting an emergency signal using a method called "Doppler shift". Computing a location using Doppler shift requires the satellite to be moving.

19.    Geostationary Search and Rescue (GEOSAR) Satellites stay in one fixed location relative to the earth. GEOSAR satellites cannot provide an independent location of a 406 MHz emergency beacon, but they can provide near-instantaneous detection of an emergency signal. On average, the GEOSAR satellites provide a 46-minute time advantage over a LEOSAR satellite for first detection of a 406 MHZ emergency beacon.

20.    On December 3, 2020 in the Atlantic Ocean off of Cape May, New Jersey the fishing vessel CONCH'RD in the early afternoon suffered a catastrophic capsizing due to the negligent operation of the vessel by Adrian Avena, acting on his own behalf or on behalf of a corporate defendant called AA Commercial, LLC. The loss of that vessel was due to

negligence, and through the gross unseaworthiness of the vessel leading to the vessel taking on water, capsizing, and eventually sinking.

21.  As a result of the capsizing, Aaron Greenberg, the vessel's deckhand, was cast into the frigid waters of the Atlantic Ocean. Over the course of the next couple hours, he eventually developed hypothermia, loss of orientation, loss of function of his physical capabilities, and eventually succumbed to the ocean's waters and drowned. He suffered a horrendous death which could have been averted had the vessel been seaworthy and Adrian Avena had not negligently operated same.

22.  Upon information and belief, the capsizing of the vessel happened at approximately 1:30 p.m. local time.

23.  Indisputable evidence shows that after a period of time subsequent to the capsizing of the vessel, an Emergency Position Indicating Radio Beacon (EPIRB) carried aboard the vessel began transmitting a signal that the vessel had submerged sufficiently to activate that EPIRB's function. That EPIRB device was assigned by NOAA registration number 2DCC8-10FFCC-FFBFF (and was captured in the incident / "site" as no. 276667).

24.  That EPIRB was owned by and registered to third-party defendant Daniel J. Avena and associated with a vessel called the GOLD RUSH II. Upon information and belief, the GOLD RUSH II was/is a vessel owned by Daniel J. Avena.

25.  The registration of the EPIRB to the GOLD RUSH II expired in November 2017, and was never renewed, and no authority was informed that the EPIRB with registration number 2DCC8-10FFCC-FFBFF (and incident / "site" no. 276667) was physically transferred to and installed on the CONCH'RD.

26.    EPIRB devices are designed to send radio broadcasts to various reception facilities and in particular a system of geostationary and orbiting satellites above the earth. In the coastal waters of and near the United States, upon receipt of the signals, the receiving satellite communicates with land based stations initially operated by NOAA. The signals from the devices carry various forms of information including information from which the device's location can be determined.

27.    On December 3, 2020, a geostationary satellite operated by NOAA received a broadcast signal from the EPIRB device that had been installed aboard the CONCH'RD. The EPIRB device broadcasting the signal was the device registered to the GOLD RUSH II, with registration number 2DCC8-10FFCC-FFBFF. This signal was received at approximately 2:07 p.m. local time.

28.    Within minutes the EPIRB registration number had been identified and the electronic signal was forwarded to a NOAA base station which then forwarded the information to the United States Coast Guard.

29.    Upon information and belief that report went to Coast Guard District 5 in Norfolk/Portsmouth, Virginia.

30.    Upon information and belief, shortly after 2:07 p.m., urgent marine broadcasts by the U.S. Coast Guard began advising that an EPIRB aboard or related to the vessel GOLD RUSH II was sending out a distress signal. The broadcasts identifying the vessel in distress as GOLD RUSH II began shortly after 2:09 p.m. and continued to at least until 2:31. Each broadcast during that time period referenced GOLD RUSH II and not CONCH'RD as the vessel in distress.

8

31.   Simply because an emergency distress signal from an EPIRB signal has been received by a geostationary satellite, or even a low-level or mid-level orbiting satellite, it does not mean that the EPIRB's position can be immediately ascertained. Often several orbits of passing low and mid-level satellites using triangulation technology and Doppler shift analysis are necessary in order to fix a latitude and longitude position of the broadcasting EPIRB.

32.   The fixing of a location of an EPIRB can take a significant amount of time as the EPIRB signal passes from the satellite system, gets communicated to the earth and is then processed at data centers and is then forwarded to emergency personnel for handling.

33.   Upon information and belief, at approximately 2:30:36 p.m. local time sufficient data was acquired to determine a general latitude and longitude for the broadcasting EPIRB with registration number 2DCC8-10FFCC-FFBFF.  It was determined that the signaling EPIRB was somewhere within the search area of Sector Delaware Bay in District 5, in particular in the ocean in the vicinity of Coast Guard Station Cape May.  The Coast Guard in that Sector was tasked with the responsibility to appropriately respond to the emergency signaling.  An appropriate response includes determining whether it is a false alarm or an emergency and then taking appropriate search and rescue action.

34.   At about this time, 2:09 p.m. local time, a telephone call was made from the Coast Guard to third-party defendant Daniel J. Avena because it was determined that he was the owner of the signaling EPIRB, which bore registration number 2DCC8-10FFCC-FFBFF.  It had been registered in 2015 and associated with the vessel GOLD RUSH II, and the registration expired on November 3, 2017 and was not renewed.

35.     At about 2:36 p.m. local time another phone call was made between Daniel J. Avena and

        the Coast Guard, and for the first time the Coast Guard was advised that the signaling

        EPIRB was not affixed to or related anymore to the GOLD RUSH II, but rather it had

        been transferred to and affixed to a different vessel, the CONCH'RD.

36.     At that time, and for the past one hour, two soaked and freezing crewmembers, Aaron

        Greenberg, and Adrian Avena, were desperately holding onto the capsized floating hull of

        CONCH'RD.

37.     At either 2:36 p.m. or 2:40 p.m. the Coast Guard began urgent marine broadcasts that

        identified the previously described vessel in distress with the EPIRB signaling as the

        CONCH'RD, not the GOLD RUSH II.

38.     At approximately 2:44 p.m. a composite fix was finally determined on the exact location

        of the signaling EPIRB from CONCH'RD, and was made available to Coast Guard rescue

        units. The location of the vessel distress signal was determined to be at latitude 38. 55.3N,

        longitude 74.32.7W.

39.     At approximately 2:48 p.m. local time, the composite fix was communicated to Coast

        Guard sector Delaware Bay and/or Coast Guard station Cape May, and that information in

        turn became usable for performing an actual search and rescue.

40.     At about 2:48 p.m., the Coast Guard also informed third party defendant Daniel J. Avena

        in a telephone conversation where the composite fix location of the EPIRB signal was.

41.     Third-party defendant Daniel J. Avena contacted acquaintances of Adrian Avena as well

        as his own friends and acquaintances attempting to muster a private rescue response.

42.     The United States Coast Guard, at approximately 2:53 p.m. local time, directed the Coast

10

Guard cutter, the LAWRENCE LAWSON, to divert from its then current mission to go to aid the CONCH'RD. The LAWSON eventually arrived at the scene of the sinking at approximately 4:01 p.m.

43. Upon information and belief, at around 2:44 p.m. a Coast Guard helicopter was working over the Atlantic Ocean not far from the site of the capsized vessel performing law enforcement activities. Assuming that information is correct that helicopter could have been and should have been diverted at that time, or previously about 2:31 p.m. to the scene to attempt to rescue the CONCH'RD crew, but was not.

44. Upon information and belief, a 'ready waiting' helicopter at station Cape May was detailed to the scene of the capsizing at approximately 3:16 p.m. local time and arrived on site at approximately 3:26 p.m.

45. According to statements attributed to petitioner Adrian Avena, Aaron Greenberg lost his grip on the upturned floating hull of the CONCH'RD and floated off and submerged, succumbing to the sea and drowning at approximately 3:15 p.m.

46. The first rescue boat, operated by good Samaritans, arrived at the scene at approximately 3:35 p.m. and rescued Adrian Avena. The rescue boat, ironically, was in fact a very fast sport fishing vessel owned by Adrian Avena called the JERSEY BOY and operated by Adrian and Daniel Avena's acquaintances/friends.

47. During the period around 1:30 p.m. through 3:00 p.m., local commercial fishing operations were being performed by numerous fishing vessels in the vicinity where CONCH'RD had been fishing as well.

48. One commercial fisherman working upon his own conch boat advised that he saw

11

CONCH'RD performing fishing operations that afternoon at a time which would have been shortly before CONCH'RD capsized.

49.     Fishermen working on the water near CONCH'RD's location have stated that had a Coast Guard urgent marine broadcast been made that it was the CONCH'RD that was the vessel in distress based on the signaling from the EPIRB associated with it, they could have and would have gone to the aid of the vessel, and would have had sufficient time to arrive and save the life of Aaron Greenberg. However, because urgent marine broadcasts between 2:09 PM and 2:40 PM were stating that the vessel in distress whose EPIRB was signaling was the GOLD RUSH II, not the CONCH'RD, these potential good Samaritans, who could have saved and would have saved Aaron Greenberg, took no action upon hearing the messages. This is because they were not familiar with a fishing vessel GOLD RUSH II, nor would they have known where that vessel generally would have been on the open ocean. However, if the broadcasts had been about the CONCH'RD being the vessel in distress, these fishermen would have known the boat, its operators and where was the likely location where it would have been working, as it was known to be a 'conch boat." Those fishermen working on the water could have and would have stopped working and gone to provide aid and assistance to the CONCH'RD and its crew, including Aaron Greenberg.

50.     The failure of the early Coast Guard broadcasts to identify the boat in distress as the CONCH'RD, instead of GOLD RUSH II, significantly delayed the private vessel rescue response which would have saved Aaron Greenberg. These delays are directly attributable to the failure of Third-Party Defendant Daniel J. Avena failing to properly register the

EPIRB with NOAA, associating the device with CONCH'RD, as he should have. Those delays contributed to the death of plaintiff's decedent.

51.     The Coast Guard 'ready waiting' helicopter arrived at the site of the capsized vessel at approximately at 3:36 p.m. local time, and directed the JERSEY BOY to return to port with Adrian Avena. Aaron Greenberg was nowhere to be found, having slipped under the waves some 20 minutes earlier.

52.     Third Party Defendant, CM Hammar AB ("HAMMAR"), is upon information and belief, a Swedish corporation with a principal place of business in Gothenburg, Sweden. HAMMAR designs, manufactures life raft release mechanisms.

53.     Third Party Defendant, Revere Survival Inc. ("REVERE"), is upon information and belief, a Delaware corporation with a principal place of business in Jacksonville, Florida. REVERE designs, manufactures, markets and sells life rafts. Upon information and belief, the REVERE life raft involved in this matter had a hydrostatic release mechanism appurtenant thereto. The hydrostatic release mechanism equipped on the Vessel as designed, manufactured and/or sold by CM Hammar AB.

54.     Defendant, Sea Gear Marine Supply, Inc., ("Sea Gear") is upon information and belief, was/is a corporation duly organized and existing under the laws of the State of New Jersey.  Defendant Sea Gear's business is located at 1144 Route 109, Cape May, New Jersey 08204.  At all times relevant and material defendant Sea Gear was/is doing business in New Jersey.

55.     Upon information and belief, defendant Sea Gear was the vendor of the REVERE life raft with appurtenant HAMMAR release mechanism that was installed on CONCH'RD prior

to and during its final voyage.

56.     Upon information and belief, on December 3, 2020, the vessel CONCH'RD was equipped

with a REVERE life raft with HAMMAR release mechanisms. The life raft failed to

deploy despite the fact that it had a hydrostatic release mechanism which was supposed to

deploy the life raft if the device was submerged 1.5 meters.

57.     Upon information and belief, at the time of the vessel's sinking/capsizing, the

Vessel was equipped with a life raft manufactured and/or sold by Revere and equipped

with a Revere life raft rack, and hydrostatic release manufactured and/or sold by Hammar,

which were sold as a package.

58.     On or about December 3, 2020, when the Vessel capsized, the hydrostatic release

mechanism, which is supposed to automatically deploy the life raft in emergency

situations, failed to release the life raft when submerged, causing, in whole or in part, the

death of Aaron Greenberg.

59.     On or about December 3, 2020, Aaron Greenberg was lost at sea and presumed dead due

to the negligence and other liabilities of Third Party Defendants Daniel Avena, the United

States of America, Hammar, Revere and Sea Gear.

**FIRST CAUSE OF ACTION: LIABILITY FOR NEGLIGENCE OF DANIEL J. AVENA**

60.     Third-party defendant DANIEL J. AVENA ("D. Avena") outfitted the operation of the

CONCH'RD. He acted as an independent agent or volunteer, assisting Petitioner

ADRIAN AVENA ("A. Avena") to get his conch business, using the CONCH'RD, off

the ground so it could become viable and profitable.

61.     The EPIRB with registration number 2OCC810FFCFFBFF was installed on CONCH'RD

14

by D. Avena at the end of September, 2020 or early October 2020, more than two months before the tragic sinking of CONCH'RD.

62.    D. Avena failed to re-register the EPIRB with registration number 2OCC810FFCFFBFF with the appropriate authority, NOAA, at any time after November 3, 2017, when its prior registration expired, although he was required to do so by law when he transferred the device to and had it installed on the CONCH'RD.

63.    The failure to re-register the EPIRB after installing it on the CONCH'RD constituted a violation of federal law, was negligence and constitute negligence per se.

64.    At approximately 2:09 on December 3, 2020 D. Avena was contacted by the United States Coast Guard from Norfolk, Virginia advising him that his lapsed registered EPIRB was providing a distress signal from EPIRB and it had been received by NOAA and forwarded to the Coast Guard. At that time he was asked if it was a false alarm to which he responded that it was not a false alarm. At that time he did not advise the caller that he had shifted the EPIRB from GOLD RUSH II to CONCH'RD.

64.    He failed to advise that he had installed, or allowed to be installed, the EPIRB on the CONCH'RD and it was no longer associated with GOLD RUSH II because he knew that he had violated federal law by not doing so.

65.    Not only was the failure to properly register the EPIRB with the appropriate federal authorities a violation of law, that failure caused confusion with the federal authorities charged with performing searches and rescues in the marine environment. This greatly delayed a broadcast to the marine community in sector Delaware Bay, and specifically in and about station Cape May, that the distress signal received was from the CONCH'RD,

15

and not GOLD RUSH II.

66.   The first time that D. Avena informed the Coast Guard that the EPIRB was on the
      CONCH'RD was at about 2:40 p.m. local time. Thus, approximately 31 minutes passed
      by with the Coast Guard broadcasting urgent marine broadcasts misidentifying which
      vessel was in distress.

67.   Many commercial fishing vessels were working nearby the last location of the upright
      CONCH'RD, and knew of its location where it was working. If an urgent marine
      broadcast had been made identifying the CONCH'RD as the vessel in distress some or all
      of those vessels could have and would have come to the aid of the seafarers on
      CONCH'RD and would have saved Aaron Greenberg's life.

68.   D. Avena's negligence and violation of federal law by not properly registering the EPIRB
      thus created confusion as to the identity of the vessel in distress after the emergency
      transmissions from the EPIRB were received, and his not immediately advising the Coast
      Guard of that failure was a proximate cause of Aaron Greenberg not being saved and thus
      caused his wrongful death, because broadcasts were made mis-identifying the correct
      vessel, delaying search and rescue operations.

69.   D. Avena was negligent as aforesaid, and was careless and reckless in not fulfilling his
      duties and responsibilities with respect to the registration of the EPIRB, the purpose of
      which was to save lives in the marine environment if and when a catastrophe occurred to
      a vessel and its crew.

70.   By reason of the negligence of D. Avena, A. Avena, AA Commercial LLC, the United
      States of America, Hammar, Revere and Sea Gear, jointly and severally, and the

16

unseaworthy condition of the vessel, Aaron Greenberg was severely injured, suffered physical and psychological injuries; he sustained injury, shock and trauma to his body, he was caused to have hypothermia, eventually leading to his drowning death. His beneficiary, his daughter K.G. is losing, has lost and will lose the financial support, comfort and social support, loss of society, education and advice of her father, all of which shall be compensated by the trier of fact. By reason of the matters aforesaid, the beneficiary of claimant's decedent's estate was and is deprived of his financial and emotional support and guidance, loss of society and such other elements of damages for his wrongful death to which in this action the beneficiary and the personal representative of the estate are entitled to claim under the laws of the State of New Jersey and the General Maritime Law.

71. By reason of the foregoing claimant claims damages in the amount found fair and reasonable by the trier of fact.

### SECOND CAUSE OF ACTION: LIABILITY FOR NEGLIGENCE OF THE UNITED STATES OF AMERICA [2]

72. Claimant repeats and realleges each of the foregoing allegations, and those in the annexed answer and claim, as if each and every one was fully restated herein.

73. The United States Coast Guard had an obligation to accurately and correctly convey among its various offices, agents, sectors, and stations information provided to it by D. Avena, when the Coast Guard contacted him with respect to the initial notification from the geostationary satellite. At that time D. Avena may have told the Coast Guard that the

17

EPIRB in question was on the CONCH'RD, not the GOLD RUSH II.

74.   D. Avena may contend that upon receiving the initial phone call from the Coast Guard he
      advised the Coast Guard that the EPIRB was not on the vessel called GOLD RUSH II,
      but was on the F/V CONCH'RD, on which his son A. Avena and Aaron Greenberg were
      fishing.

75.   Claimant herein is concerned that third party defendant Daniel J. Avena will contend that
      at approximately 2:09 on December 3, 2020 he was contacted by the United States Coast
      Guard in or about Norfolk, Virginia advising that an emergency signal from his EPIRB
      with registration number 2OCC810FFCFFBFF, and assigned to the GOLD RUSH II, had
      been received. At that time he was asked if it was a false alarm. At that time, he
      responded it was not a false alarm. Claimant is concerned that D. Avena will contend that
      in that phone conversation he advised the caller from the Coast Guard that he had shifted
      the EPIRB from GOLD RUSH II to CONCH'RD. If he did so, then the Coast Guard
      mismanaged that information, delaying Coast Guard and private rescue efforts, because
      the Coast Guard broadcasted misinformation about the correct vessel in distress. As such,
      the Coast Guard was negligent and that negligence was a proximate cause of Aaron
      Greenberg's death.

76.   Whomever that agent, employee or officer was of the Coast Guard who had that
      communication with D. Avena at or about 2:09, if that Coast Guard person was told that
      the EPIRB signaling its immersion was actually on CONCH'RD, and then that person
      failed to fully and appropriately pass on that correct information that the EPIRB that was

---

[2] See Footnote 1 regarding the operative nature of this pleading vis a vis the United States of America.
Additionally, to the extent that this Second Cause of Action asserts facts that can and should be admitted or

emergency signaling was related to the CONCH'RD and not the GOLD RUSH II, then that person's failure to do so was negligent. This failure caused the urgent marine broadcasts that started approximately at 2:09 PM to misidentify the vessel in extremis, negligently causing delays in search and rescue responses from the Coast Guard assets. The mis-communication further delayed private individuals, who could have and would have gone to the scene of the capsized vessel and rescued Aaron Greenberg, from going to CONCH'RD's aid. The failure of the Coast Guard for approximately 31 minutes to broadcast the correct name of the vessel in trouble was a proximate cause of Aaron Greenberg's death because, but for that delay, private good Samaritans could have and would have rescued him.

77. This failure was not performed as a discretionary function by the Coast Guard, its agents, employees or officers. The U.S. Coast Guard failed to properly to properly and appropriately perform a search and rescue for Adrian Avena and Aaron Greenberg.

78. Further causing harm to claimant and claimant's decedent is that at least from approximately 2:09 p.m. through 3:00 p.m. on December 3, 2020, upon information and belief, the United States Coast Guard had a helicopter and other assets working over the ocean and on the ocean in the area where the CONCH'RD had capsized. At approximately 2:40 p.m. the exact location of the broadcasting EPIRB from CONCH'RD became known. The Coast Guard could have and should have directed that helicopter and/or other assets to the scene of the capsizing to provide rescue and aid to the two seamen who had been aboard the vessel, but did not, constituting negligence on the Coast Guard's part.

---

denied by the other parties, claimant Wolfe demands responses thereto by all other parties.

79.   Inexplicably, the Coast Guard failed to promptly direct that helicopter asset and/or other assets, other than the LAWSON (which it negligently delayed dispatching), to travel to the site from which the EPIRB was transmitting and rescue the seamen hanging on to the hull of the capsized vessel.

80.   Those failures were not an exercise of a discretionary function by the Coast Guard, its agents, employees or officers.

81.   By reason of the negligence of the United States of America, jointly and severally, with the petitioners and D. Avena, Revere, Hammar and Sea Gear, Aaron Greenberg was severely injured, suffered physical and psychological injuries; he sustained injury, shock and trauma to his body, he was caused to have hypothermia, eventually leading to his drowning death. His beneficiary, his daughter K.G. is losing, has lost and will lose the financial support, comfort and social connection of her father, all of which shall be compensated by the trier of fact. By reason of the matters aforesaid, the beneficiary of claimant's decedent's estate was and is deprived of his financial and emotional support and guidance, loss of society and such other elements of damages for his wrongful death to which in this action the beneficiary and the personal representative of the estate are entitled to claim under the laws of the State of New Jersey and the General Maritime Law.

82.   By reason of the foregoing claimant claim damages in the amount found fair and reasonable by the trier of fact.

### THIRD CAUSE OF ACTION: LIABILITY OF HAMMAR AND REVERE FOR
### STRICT PRODUCT LIABILITY

83.     Claimant repeats and reallege each and every allegation contained in the above

        paragraphs with the same force and effect as if fully set forth herein.

84.     Upon information and belief, Hammar and/or Revere are the designers, manufacturers,

        distributors and/or sellers of the life raft and hydrostatic release mechanism installed

        onboard the Vessel at the time of the casualty.

85.     At all times material hereto, Hammar and/or Revere were engaged in the business of

        introducing the life raft and hydrostatic release into the stream of commerce and did so by

        marketing and selling same to Third-Party Daniel Avena and/or to the Petitioners, and

        Daniel Avena who along with Plaintiff Adrian Avena, installed the life raft and

        hydrostatic release mechanism on the vessel CONCH'RD prior to its ill-fated voyage on

        December 3, 2019.

86.     The hydrostatic release was designed and warranted to deploy the life raft upon immersion

        of the Vessel, for the specific purpose of saving a vessel's crew and or passengers.

87.     Upon information and belief, the life raft and hydrostatic release mechanism that was

        designed and/or manufactured by Hammar and/or Revere was defective, rending it

        unreasonably dangerous to the crew aboard the Vessel.

88.     On or about December 3, 2020, when the vessel capsized and partially sank, the Hammar

        hydrostatic release was sufficiently submerged to cause the release mechanism to activate,

        but did not activate, leaving the Vessel's two crew clinging to the vessel, and Aaron

        Greenberg was thereafter lost at sea.

89.     As a result of the defective and improper design, marketing and/or manufacture of the

21

hydrostatic release, the life raft aboard the Vessel remained submerged and failed to deploy, causing, in whole or in part, the presumed death of Aaron Greenberg.

90. Had the life raft aboard the Vessel deployed as it should have, after the vessel began to submerge, Aaron Greenberg could have and would have used it to save himself.

91. As a result of defective manufacture and/or defective design of the life raft and hydrostatic release device, and the distribution and sale of the defective hydrostatic release, Hammar and/or Revere are strictly liable to the Estate of Aaron Greenberg for his personal injury and wrongful death.

## FOURTH CAUSE OF ACTION: LIABILITY OF HAMMAR AND REVERE FOR BREACH OF WARRANTIES

92. Claimant repeats and reallege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

93. In installing the life raft and hydrostatic release on the Vessel, Plaintiffs relied upon express and implied warranties by the Third Party Defendants HAMMAR and Revere, including but not limited to, express warranties as to the safety, simplicity and efficiency of the life raft and hydrostatic release, as well as the implied warranties of workmanlike performance and fitness for its intended purpose.

94. The express warranty breached is that the hydrostatic release mechanism sold to the vessel's owner(s) and installed upon CONCH'RD would, among other things, deploy the life raft if submerged 1.5 meters.

95. Prior to Aaron Greenberg's death, while he was desperately holding onto the partially submerged vessel, attempting to save his and Adrian Avena's life, the life raft and

22

hydrostatic release mechanism were submerged more than 1.5 meters, upon information and belief.

96.     Revere and Hammar breached the above express warranty, other express warranties and implied warranties.

97.     Revere and Hammar breaches of the express and implied warranties resulted in the death of Aaron Greenberg, and damages to the Claimant for which claim herein is made.

### FIFTH CAUSE OF ACTION: LIABILITY OF HAMMAR AND REVERE FOR NEGLIGENT MISREPRESENTATION

98.     Claimant repeats and realleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

99.     Third Party Defendants HAMMAR and Revere made false representations about the design, manufacture, operability, suitability, quality, safety, efficacy, and use of the life raft and hydrostatic release. The misrepresentation was that the hydrostatic release mechanism would release the life raft if it was submerged to a depth of 1.5 meters.

100.    Upon information and belief, Plaintiffs relied on those representations in having the life raft and hydrostatic release installed on the Vessel and Aaron Greenberg relied upon the representations in agreeing to work upon the vessel, and further, while working on the vessel.

101.    As a result of Revere and Hammar's misrepresentations, Aaron Greenberg died because the hydrostatic release did not release the life raft when submerged contrary to the representations made by these third-party defendants that the equipment was safe and would perform as represented.

23

102.    The making of the misrepresentations was negligent by Revere and Hammar. As a result

     of Revere and Hammar making those negligent misrepresentations to Avena and AA

     Commercial, it induced them to purchase the Revere life raft with Hammar release

     mechanism. The misrepresentations in part led to the use of the life raft on December 3,

     2020 on the vessel CONCH'RD. In foreseeable circumstances on the ocean, the life raft

     failed to deploy even though the release mechanism was submerged more than 1.5 meters.

     The potential likelihood that the life raft would not deploy in situations experienced by

     CONCH'RD on that day was something that Revere and Hammar knew or should have

     known. Because of that negligence, accordingly, it led to the death of Aaron Greenberg

     and the near demise of Adrian Avena.  The death of Aaron Greenberg, accordingly, was

     caused in whole or in part, by the negligence of Revere and Hammar, as aforesaid.

**SIXTH CAUSE OF ACTION AGAINST HAMMAR AND REVERE: LIABILITY FOR NEGLIGENCE IN THE DESIGN, MANUFACTURE, SALE AND DISTRIBUTION OF THE REVERE LIFERAFT WITH HAMMAR RELEASE MECHANISM**

103.    Claimant repeats and realleges each and every allegation contained in the above

     paragraphs with the same force and effect as if fully set forth herein.

104.    Third Party Defendants, Revere and Hammar, negligently designed, manufactured, sold

     and distributed the life raft and hydrostatic release fitted on the Vessel.

105.    As a result of the negligence of Third Party Defendants Revere and Hammar, Aaron

     Greenberg died because the hydrostatic release did not release the life raft, which failed to

     deploy when submerged.

106.    As a result of the negligence of Third Party Defendants Revere and Hammar, Claimant

     asserts claims for damages for the wrongful death and survival claims she asserts for the

24

wrongful death of Aaron Greenberg.

## SEVENTH CAUSE OF ACTION: LIABILITY FOR HAMMAR'S AND REVERE'S FAILURE TO WARN

107.   Claimant repeats and realleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

108.   Third Party Defendants HAMMAR and Revere had a duty to provide proper warnings to Plaintiffs and the crew working aboard CONCH'RD , including claimant's decedent, Aaron Greenberg, regarding the deployment and use of the life raft and hydrostatic release mechanism and any history of failures thereof.

109.   Third Party Defendants failed to provide proper warnings to Plaintiffs and the foreseeable users of the life raft and release mechanisms, including foreseeable crew members, regarding the deployment and use of the lift raft and hydrostatic release mechanism and any history of failures thereof. They failed to warn the purchasers and foreseeable users that the life raft might not deploy at 1.5 meters submerged depth.

110.   As a result of the failure by Third Party Defendants to provide proper warnings, it contributed to Aaron Greenberg dying because, in this case, the hydrostatic release did not release the life raft when it was submerged even though plaintiffs and Mr. Greenberg had expectations it would release, and further, were not warned of failures of other and similar make and model life raft release mechanisms, nor were they warned of what could or should be done to insure deployment of the life raft in the eventuality that the vessel upon which they were working submerged, capsized or otherwise had a failure which called for use of the life raft.

111.   As a result of the failure by Third Party Defendants to provide proper warnings, Aaron

Greenberg died, and claimant herein brings claims for damages for the death of Mr.
Greenberg and a survival claim for the damages suffered by him and his estate and
beneficiary.

### EIGHTH CAUSE OF ACTION: STRICT PRODUCT LIABILITY
### OF DEFENDANT SEA GEAR

112.    Claimant repeats and realleges each and every allegation contained in the above
paragraphs with the same force and effect as if fully set forth herein.

113.    Upon information and belief, defendant Sea Gear, was/is the vendor, distributor, supplier,
marketer, and seller of the life raft and the hydrostatic release mechanism installed
onboard the Vessel at the time of the casualty.

114.    At all times material hereto, defendant, Sea Gear, was engaged in the business of
introducing life rafts and hydrostatic release mechanisms into the stream of commerce and
did so by marketing and selling same to Third-Party Daniel Avena, and Plaintiffs Adrian
Avena and AA Commercial. The petitioners and Daniel Avena installed the life raft and
hydrostatic release mechanism on the vessel CONCH'RD prior to its ill-fated voyage on
December 3, 2019.

115.    The hydrostatic release was designed and warranted to deploy the life raft upon immersion
of the Vessel, for the specific purpose of saving a vessel's crew and or passengers.

117.    Upon information and belief, the life raft and hydrostatic release mechanisms were
designed and/or manufactured by Third-Party Defendants Hammar and/or Revere were
defective, rendering them unreasonably dangerous to the foreseeable consumers thereof,
including the crew aboard the Vessel.

26

118.   On or about December 3, 2020, the Vessel partially sank, the Hammar hydrostatic release was sufficiently submerged, but did not release, leaving the Vessel's two crew clinging to the capsized vessel, and Aaron Greenberg was thereafter lost at sea.

119.   As a result of the defective and improper design and/or manufacture of the hydrostatic release, the life raft aboard the Vessel remained submerged and failed to deploy, causing, in whole or in part, the death of Aaron Greenberg.

120.   Defendant Sea Gear was under a duty to exercise due care in the marketing, assembling, distribution, testing and sale of the life raft and the appurtenant hydrostatic release mechanism.

121.   Prior to December 3, 2020, Defendant Sea Gear, marketed, packaged, labeled, distributed, tested and sold the life raft that was installed aboard CONCH'RD within the State of New Jersey.

122.   The life raft was sold by Defendant Sea Gear in a defective condition and was unreasonably dangerous to users, including Aaron Greenberg.

123.   Had the life raft aboard the Vessel deployed as it should have, after the vessel submerged, Aaron Greenberg could have and would have used it to save himself.

124.   Defendant Sea Gear failed to inspect the life raft to determine whether it was properly designed, assembled and/or manufactured.

125.   Defendant Sea Gear introduced into and failed to remove the life raft with Hammar release mechanisms from the stream of commerce.

126.   As a result of defective manufacture, defective design of the life raft and hydrostatic release device, the failure to warn, the misrepresentations made in the distribution and sale

27

of the defective life raft, defendant Sea Gear is strictly liable to the Estate of Aaron

Greenberg for his personal injury and wrongful death.

### NINTH CAUSE OF ACTION AGAINST DEFENDANT SEA GEAR: LIABILITY FOR BREACH OF WARRANTIES

128. Claimant repeats and reallege each and every allegation contained in the above

paragraphs with the same force and effect as if fully set forth herein.

129. Defendant Sea Gear breach of its duty to use due care in the sale of the life raft utilized by

Aaron Greenberg, acting negligently and carelessly in breaching express warranties

relative to whether the life raft was fit for its intended use.

130. Furthermore, by putting the defective life raft and hydrostatic release into the stream of

commerce by selling the life raft and the hydrostatic release to defendant Daniel Avena,

Adrian Avena and AA Commercial for the Vessel CONCR'D, the Plaintiffs relied upon

express and implied warranties by the Defendant, Sea Gear that the product produced,

manufactured, and/or designed by the Third Party Defendants, HAMMAR and Revere,

including but not limited to, express warranties as to the safety, simplicity and efficiency

of the life raft and hydrostatic release, as well as the implied warranties of workmanlike

performance and fitness for its intended purpose.

131. The express warranty breached is that the hydrostatic release mechanism sold to Daniel

Avena and installed upon CONCHR'D would, among other things, deploy the life raft if

submerged 1.5 meters.

132. Prior to Aaron Greenberg's death, while he was desperately holding onto the partially

submerged vessel, attempting to save his and Adrian Avena's life, the life raft and

hydrostatic release mechanism were submerged more than 1.5 meters, upon information and belief.

133. Defendant Sea Gear, through its employees, agents, and representatives was otherwise negligent and careless in that it sold the life raft in a condition which was unreasonably dangerous to users. Further, it negligently inspected the installation thereof and certified it was proper, fit and appropriate for the use as a life saving device.

134. The defective and dangerous condition of the life raft existed at the time it left the control of Defendant Sea Gear and did not undergo substantial changes thereafter.

135. Defendant Sea Gear breached the above express warranty, other express warranties and implied warranties.

136. Defendant Sea Gear's negligence and breaches of the express and implied warranties and failure to warn resulted in the death of Aaron Greenberg, and damages to the Claimant for which claim herein is made.

**TENTH CAUSE OF ACTION AGAINST DEFENDANT SEA GEAR: LIABILITY FOR NEGLIGENCE**

137. Claimant repeats and realleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

138. Defendant Sea Gear had a duty to routinely inspect and take other reasonable measures to ensure the products, like the life raft, which they were putting into the stream of commerce were not defectively manufactured and/or defectively designed.

139. Defendant Sea Gear had a duty to take reasonable measures to protect plaintiffs from said products being sold within its establishment. Further, it negligently inspected the installation thereof and certified it was proper, fit and appropriate for the use as a life

saving device

140.  Defendant Sea Gear breached its duty to plaintiffs by allowing a defectively designed

and/or defectively manufactured and dangerous product to enter the stream of commerce

and then be sold to defendant Daniel Avena who installed it on the Vessel CONCR'D.

141.  As a result of the negligence of Defendant, Sea Gear, Aaron Greenberg died because the

hydrostatic release did not release the life raft, which failed to deploy when submerged.

142.  As a result of the negligence of defendant Sea Gear, Claimant asserts claims for damages

for the wrongful death and survival claims she asserts for the wrongful death of Aaron

Greenberg.

## ELEVENTH CAUSE OF ACTION AGAINST DEFENDANT SEA GEAR: LIABILITY FOR FAILURE TO WARN

143.  Claimant repeats and realleges each and every allegation contained in the above

paragraphs with the same force and effect as if fully set forth herein.

144.  Defendant Sea Gear as the sellers of the life raft had a duty to provide proper warnings to

Plaintiffs and their deck hands, including claimant's decedent, Aaron Greenberg,

regarding the deployment and use of the life raft and hydrostatic release and any history of

failures thereof.

145.  Defendant Sea Gear failed to provide proper warnings to Plaintiffs and the crew expected

to sail on CONCH'RD, including its deckhands. The warnings should have been given

was that life raft and hydrostatic release might not release at 1.5 meters submerged depth

and any history of failures thereof.

146.  Defendant Sea Gear breached the aforementioned duty by failing to provide adequate

warnings or instructions about the dangers of the life raft.

147.   As a result of the failure by Defendant Sea Gear to provide proper warnings, it

contributed to Aaron Greenberg dying because, in this case, the hydrostatic release did

not release the life raft when it was submerged even though plaintiffs and Mr. Greenberg

had expectations it would release, and further, were not warned of failures of other and

similar make and model life raft release mechanisms, nor were they warned of what could

or should be done to insure deployment of the life raft in the eventuality that the vessel

upon which they were working submerged, capsized or otherwise had a failure which

called for use of the life raft.

148.   As a result of the failure by Defendant Sea Gear to provide proper warnings, Aaron

Greenberg died, and claimant herein brings claims for damages for the death of Mr.

Greenberg and a survival claim for the damages suffered by him and his estate and

beneficiary.

**WHEREFORE**, claimants pray that judgment be entered against the petitioners and third

party defendants on the within causes of action, and for such other and further relief,

including interest, attorneys fees and punitive damages, if warranted.

Dated: Raritan, New Jersey          HOFMANN & SCHWEITZER
       November 16, 2022          *Attorneys for Third-Party Plaintiff*

                                  By:_____
                                        Paul T. Hofmann (PH1356)
                                        1130 Route 202 South, Ste. 7A
                                        Raritan, New Jersey 08869
                                        Tel: 908-393-5662
                                        Fax: 212-465-8849
                                        paulhofmann@hofmannlawfirm.com